COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.—CHICAGO TRANSIT AUTHORITY, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.—NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a Metra, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.—BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Second District   Nos. 2—06—1284, 2—06—1285, 2—06—1286, 2—07—0066, 2—07—0078 and 2—07—0104 cons.

Opinion filed September 17, 2009.—Rehearing denied April 6, 2010.

Paul F. Hanzlik and E. Glenn Rippie, both of Foley & Lardner LLP, David M. Stahl and Adam Oyebanji, both of Eimer Stahl Klevorn & Solberg LLP, Darryl M. Bradford, of Commonwealth Edison Company, and Anastasia M. O'Brien and Richard G. Bernet, both of Exelon Business Services Company, all of Chicago, for petitioner.

R. Eric Robertson and Ryan E. Robertson, both of Lueders, Robertson & Konzen, of Granite City, for respondents Illinois Industrial Energy Consumers.

Richard C. Balough and Karen Rowan, Eugene L. Munin, Barbara Smith, Kevin J. Loughlin, Stephen Wood, and Rachel Kaplan, all of Chicago Transit Authority, of Chicago, for respondent Chicago Transit Authority.

Edward R. Gower and William P. Hardy, both of Hinshaw & Culbertson LLP, of Springfield, and Michael C. Noland and John A. Milano, both of Northeast Illinois Regional Commuter Railroad Corporation, of Chicago, for respondent Northeast Illinois Regional Commuter Railroad Corporation.

JUSTICE HUDSON delivered the opinion of the court:

These consolidated appeals arise out of the filing by Commonwealth Edison (ComEd) of an action with the Illinois Commerce Commission (Commission) in which ComEd sought to restructure and alter the rates it charged certain customers. The Commission entered

an initial order on July 26, 2006, and a subsequent order on rehearing on December 20, 2006. Numerous parties are involved. Several of them object to various aspects of the Commission's order, and several appeals were filed, which are now consolidated here. The record is voluminous, and extensive briefs were filed. However, the issues raised are, for the most part, relatively discrete. Thus, we will treat the issues separately, discussing the pertinent facts as they are relevant to each issue we address.

## I. BACKGROUND

ComEd's filing came in the wake of certain changes in Illinois's electric industry that occurred beginning in the late 1990s. In 1997, the General Assembly amended the Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 2004)) by enacting the Electric Service Customer Choice and Rate Relief Law of 1997 (Rate Relief Law) (220 ILCS 5/16—101 *et seq.* (West 2004)). This law required electric utilities to open their formerly legislatively approved monopoly. See 220 ILCS 5/16—103 (West 2004). Utilities were required to offer delivery services in addition to existing services, at least until an existing service was either abandoned or declared competitive. 220 ILCS 5/16—103 (West 2004). Delivery services are "those services provided by the electric utility that are necessary in order for the transmission and distribution systems to function so that retail customers located in the electric utility's service area can receive electric power and energy from suppliers other than the electric utility." 220 ILCS 5/16—102 (West 2004).

The Rate Relief Law brought about a number of changes on both the retail and wholesale levels. Relevant here, utilities were required to offer delivery services in a nondiscriminatory manner to all customers. In response to the new law, ComEd divested itself of its electricity generating assets. See 220 ILCS 5/16—111(g) (West 2004). ComEd became an "integrated distribution company," which the parties refer to as a "wires company." As a "wires company," ComEd's costs are now driven by the requirement that it meet the needs of a maximum number of customers, "regardless of the nature of the usage of customers." Generation of electricity is no longer a consideration. ComEd's costs as a "wires company" do not vary appreciably over time, as they did when costs were driven by generating electricity. During a transition period that ended on January 1, 2007, residential rates were reduced by 20% and nonresidential rates were frozen. ComEd proposed to restructure its rates for the post-transition period, in which it will serve two types of customers—those that purchase a bundled electri-

cal service product and those that purchase an unbundled product by which they can purchase electricity from suppliers other than ComEd and pay ComEd for delivery services. One goal was to "harmonize" customer class definitions between customers of unbundled service and customers of bundled service (customers who elected to continue under the scheme that preexisted the Rate Relief Law).

## II. STANDARD OF REVIEW

■ ■ Under well-settled legal principles, we are required to give substantial deference to the decisions of the Commission, in light of its expertise and experience in this area. *Alhambra-Grantfork Telephone Co. v. Illinois Commerce Comm'n*, 358 Ill. App. 3d 818, 821 (2005). Accordingly, on appeal from an order of the Commission, its findings of fact are to be considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 11 (1994). Though we are not bound by the Commission on questions of law (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 204 (1989)), we "will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute" (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)), which in this case is the Commission. Our review is limited to the following matters: (1) whether the Commission acted within its authority; (2) whether it made adequate findings to support its decision; (3) whether the decision was supported by substantial evidence; and (4) whether state or federal constitutional rights were infringed. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001). "Substantial evidence" means more than a mere scintilla; however, it does not have to rise to the level of a preponderance of the evidence. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997). It is evidence that a "reasoning mind would accept as sufficient to support a particular conclusion." *Citizens Utility Board*, 291 Ill. App. 3d at 304. Our supreme court has held that deference to the Commission is "especially appropriate in the area of fixing rates." *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960). On review, this court can neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 283 Ill. App. 3d 188, 200-01 (1996). With these principles in mind, we now turn to the issues raised by the parties.

### III. ANALYSIS

This appeal can be divided into two types of issues, revenue and rate structure. Only ComEd raises issues pertaining to its revenue requirement (essentially ComEd's operating expenses plus profit (see *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001))—three of them, in fact. Generally speaking, a utility determines its revenue requirement by adding operating costs to invested capital multiplied by the rate of return. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991) ("The components of the revenue requirement have frequently been expressed in the formula 'R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital)' "), quoting *Citizens Utilities Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988). The rate of return is typically established with reference to what would be a reasonable return on the present value of a utility's property. *Village of Milford v. Illinois Commerce Comm'n*, 20 Ill. 2d 556, 562 (1960). Any increase to the rate base (or invested capital) results in an increased revenue requirement. ComEd's arguments focus upon three items that it contends should have been included in its rate base. Specifically, ComEd argues: (1) it is entitled to full recovery of costs it incurred complying with the Public Company Accounting Reform and Corporate Responsibility Act of 2002 (Sarbanes-Oxley Act) (15 U.S.C. §7201 *et seq.* (2006)); (2) the Commission should have allowed it full recovery for certain incentive-based employee-compensation costs; and (3) it should have been permitted full recovery for an expenditure that was made for it by its parent company, Exelon, to fund its employee pension plan.

The balance of the issues involves rate structure and design, that is, the allocation of cost recovery responsibility to various customers. The Building Owners and Managers Association of Chicago challenges the elimination of a provision known as Rider 25 that established a more favorable rate for nonresidential consumers of electricity used for space heating. The Northeast Illinois Regional Commuter Railroad Corporation (Metra) and the Chicago Transit Authority (CTA) contend that the Commission's order results in an unconstitutional impairment of the contracts under which they (respectively) and ComEd have been operating for considerable periods of time. They also contend that the Commission's order does not comply with certain portions of the Act. A group consisting of the City of Chicago, the Board of Education of Chicago, and the Cook County State's Attorney's office challenged the elimination of Rider GCB, which allowed them to aggregate their purchases of electricity, resulting in lower overall

rates. That portion of the appeal has been settled, and we need not address it further. Additionally, at oral argument, the parties advised us that the Commission has issued a new order regarding whether ComEd could include in its rate base costs related to the requirements of the Sarbanes-Oxley Act. The parties agree that, within the context of this appeal, this issue is moot, and we accept their representations. Accordingly, we will not address this issue either.

## A. COMMONWEALTH EDISON'S APPEAL

We begin with ComEd's appeal, of which two issues remain. First, we will address ComEd's contention that the Commission should have allowed it full recovery for certain incentive-based employee-compensation costs. Next, we will consider whether ComEd should have been permitted full recovery for an expenditure that was made for it by its parent company, Exelon, to fund ComEd's employee pension plan.

■ Generally, costs are recoverable if they are reasonable and prudent. See *Business & Professional People for the Public Interest*, 146 Ill. 2d at 247 ("[I]t would be unfair to deny [ComEd] recovery of its reasonable and prudent investment due to regulatory delays which the company could not control"). Indeed, ComEd asserts that these are the only conditions it need meet for an expenditure to be included in its rate base. To this end, ComEd cites *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995), where our supreme court wrote, "In setting rates, the Commission must determine that the rates accurately reflect the cost of service delivery and must allow the utility to recover costs prudently and reasonably incurred." It is true that the limitations "reasonable" and "prudent" appear in the quoted passage. An additional limitation, which ComEd overlooks in its brief, though it acknowledged at oral argument, is also present. The sentence immediately preceding the material quoted by ComEd reads, "A public utility is entitled to recover in its rates certain *operating costs*." (Emphasis added.) *Citizens Utility Board*, 166 Ill. 2d at 121. A similar limitation appears in section 16—108(c) of the Act: "Charges for delivery services shall be cost based, and shall allow the electric utility to *recover the costs of providing delivery services* through its charges to its delivery service customers that use the facilities and services associated with such costs." (Emphasis added.) 220 ILCS 5/16—108(c) (West 2004). Hence, to be recoverable, in addition to being reasonable and prudent, a cost must also pertain to operations or service delivery (for the balance of this discussion, we will refer to expenses related to both operations and delivery as costs of delivery services). Thus, both *Citizens Utility Board* and the Act expressly

make room for considerations beyond simply whether an expenditure is reasonable and prudent. Parenthetically, we note that ComEd mentions in passing a takings issue (the takings clause of the fifth amendment to the federal constitution "provides that private property shall not 'be taken for public use, without just compensation' " (*Stahelin v. Forest Preserve District*, 376 Ill. App. 3d 765, 771 (2007), quoting U.S. Const., amend. V; see *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 309, 102 L. Ed. 2d 646, 658, 109 S. Ct. 609, 616 (1989)); however, it does not develop this argument and thus we will not consider it. See *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1098-99 (2007) ("It is well settled that '[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ([210 Ill. 2d R. 341(h)(7)]), and it is not a repository into which an appellant may foist the burden of argument and research' "), quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993).

ComEd first argues that it should have been allowed to fully recoup expenditures made under an employee incentive plan. Generally, reasonable and prudent expenditures for salaries should be included in the rate base. See *Village of Milford*, 20 Ill. 2d at 566 ("The conclusion of the commission that the record in the case does not show that total operating expenses, including these officers' salaries, are unreasonable or excessive was proper, and will not be disturbed"). However, under certain circumstances, it has been held that the cost of salaries should be apportioned between shareholders and ratepayers. Hence, in *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n*, 122 Ill. App. 3d 219, 226 (1983), this court stated, "The record before us does not reflect that the officer's services were of no value; therefore, *some portion* of his salary should have been included as an operating expense." (Emphasis added.) Conversely, in *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550, 560-61 (1971), our supreme court held that the salaries of three officers should not have been included in the rate base, because the record contained undisputed evidence that they performed no valuable service to the utility. Thus, there is ample precedent making a benefit to ratepayers a condition upon which the recovery of salary-related expense depends. Accordingly, ComEd's suggestion that the Commission has "created a new test" is not well founded.

Indeed, the Commission ruled that 50% of the cost of ComEd's employee incentive plan should be included in the rate base. The Commission explained:

"Turning our attention to the individual parts of the incentive compensation structure, we agree *** that the earnings per share

('EPS') funding measure, which constitutes fifty percent of overall plan funding, should not be allowed to be recovered through rates. As the name of the funding measure suggests, the primary beneficiaries of increased earnings per share are shareholders, not ratepayers. While it is true that the entire plan funding is dependent on 'customer satisfaction,' as measured by some customer survey benchmark, we are not convinced that the link between responses to such a generic and broad customer survey and individual employee performance is strong enough to warrant recovery of incentive payments for meeting financial goals."

In essence, the Commission ruled that ComEd did not demonstrate a sufficient nexus between the earnings-per-share portion of the incentive compensation plan and a benefit to ratepayers. ComEd, of course, had the burden of proof on this issue when it was litigated before the Commission. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 746 (1995).

ComEd contends that the Commission's application of the law was erroneous. Initially, ComEd complains that the Commission did not cite any evidence in its decision. That, however, is not required. Rather, the Commission must make findings in support of its decision, and support for the findings must exist in the record. See *Commonwealth Edison Co.*, 322 Ill. App. 3d at 849. ComEd cites no authority to support its contention that the Commission must cite evidence with specificity in its order. To that end, ComEd cites *Business & Professional People for the Public Interest*, 136 Ill. 2d at 217, but that case does not require the Commission to expressly cite evidence in its orders.

ComEd further argues that the evidence contradicts the Commission's position that the earnings-per-share measure does not benefit ratepayers. It cites the testimony of Richard Meischeid (a compensation expert presented by ComEd) that incentive plans benefit everyone, including customers, because as "productivity rises, more attention is paid to cost control and more focus is given to customer service." Moreover, a financially healthy utility can obtain needed financing at a lower cost, which in turn would lower customer costs. While this evidence certainly does provide support for ComEd's position, it does not compel the conclusion that ComEd seeks.

At oral argument, ComEd suggested that the incentive plan benefitted ratepayers in the sense that attracting good employees raises the level of service customers will receive. Such a benefit is too remote. In *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 55 Ill. 2d 461, 481 (1973), the supreme court stated, "Concerning the expenditures for dues, again recognizing the split in the authorities,

we conclude that the better rule is to disallow such expenditures and hold that expenditures for dues to civic, social and athletic clubs are not operating expenses to be considered in the fixing of rates." Undoubtedly, the payment of things like health club dues would be the sort of perk that would help an employer recruit employees. Nevertheless, the court held that the nexus between such expenditures and a benefit to customers was too tenuous to include them in the utility's rate base. ComEd also pointed out at oral argument that, since a rate freeze was in effect at all times relevant to this appeal, employees could have achieved the goals of the earnings-per-share measure only by cutting costs, which would benefit ratepayers. We, however, are not convinced that this proposition is necessarily true. ComEd likely incurs some nonoperating expenses that would not be included in its rate base. To the extent that an employee controlled such costs, no benefit to ratepayers would accrue. Since the record does not establish that all such cost cutting necessarily benefitted ratepayers, ComEd has not demonstrated that the Commission erred here.

If we were deciding this issue in a vacuum, we might agree with ComEd. However, in this case, three other performance-based components of the incentive plan existed. Thus, the Commission could have reasonably concluded that the earnings-per-share portion of the plan provided only a tangential benefit to ratepayers. Indeed, the Commission characterized this portion of the incentive plan as "generic and broad" in contrast to the other three more specific components. Moreover, precedent exists for apportioning employee compensation costs between equity holders and ratepayers where an employee's duties only partially benefit ratepayers. See *Candlewick Lake Utilities Co.*, 122 Ill. App. 3d at 226. Meischeid's testimony that such plans benefit everyone necessarily entails the proposition that they provide only some benefit to customers and thus provides an adequate basis for the Commission's decision to apportion these costs. Moreover, the notion that an earnings-per-share-based employee incentive plan provides benefits to shareholders is hardly a controversial proposition.

■ ComEd's final argument is that it should have been allowed to fully recover expenditures made to fund its employee pension plan. These funds actually came from ComEd's parent corporation, Exelon. In 2005, ComEd received from Exelon an $803 million contribution, which it used to fund its pension plan. This contribution brought the funding level of the plan up to the average level of plans maintained by other similarly situated employers. ComEd now seeks to recover the weighted average cost of the contribution, that is, 8.01% per year. The earnings generated by the contribution provide a benefit of $30.2

million to ratepayers by reducing future contributions. In its initial order, the Commission ruled that ComEd had not "provid[ed] evidence that this particular method of funding the pension trust fund is reasonable." The Commission noted that ComEd could have issued debt, which typically is less expensive. The Commission acknowledged ComEd's concerns regarding the effect that the issuance of debt would likely have on ComEd's credit rating, but it found ComEd's bare assertion that its credit rating would be adversely affected an insufficient basis for ComEd to prevail on this issue. ComEd sought rehearing, proposing three alternatives. The third, which the Commission ultimately adopted, proposed that ComEd be allowed to recover the amount it would have cost ComEd to issue long-term debt to raise the sums used to fund the pension plan. This resulted in an increase of $25.3 million to ComEd's annual revenue requirement. In essence, the Commission's order entails a finding that ComEd carried its burden of proving that the third option for funding the pension plan would have been reasonable and prudent, but not the greater amount it now seeks.

As a preliminary matter, we must address the Commission's argument that ComEd is estopped from challenging this portion of its ruling. See *Libertyville Toyota v. U.S. Bank*, 371 Ill. App. 3d 1009, 1017 (2007). The Commission points to numerous places in the record where ComEd argues for the adoption of the third alternative it proposed. For example, Kathryn Houtsma, ComEd's vice president of regulatory projects, testified for ComEd that "if the Commission adopts any of the three alternatives I have proposed, the issue ComEd has raised on rehearing would be resolved." Reading this passage in isolation, we would agree with the Commission. However, J. Barry Mitchell, ComEd's president, also testified during this portion of the proceedings that, "[i]f the Commission were to enter an order on rehearing reflecting all elements of these issues as a 'package,' " ComEd would not appeal the decision. Later, he added:

> "So, therefore, if in fact these positions were not accepted as a package, it would leave us vulnerable to being cherry-picked on particular issues. Therefore, the sum total result, the aggregate effect of this package is, in fact, what we're willing to stipulate to, and we would have to reserve our rights to the extent that the circumstances as described in that sentence did not occur."

Generally, " '[e]stoppel arises when a party, by his word or conduct, *** induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position.' [Citation.]" *Solai & Cameron, Inc. v. Plainfield Community Consolidated School District No. 202*, 374 Ill. App. 3d 825, 842 (2007). Because reliance on a representation must be reasonable, an express

reservation of rights weighs heavily against a finding of estoppel. *Cf. Cohen v. Blockbuster Entertainment, Inc.*, 376 Ill. App. 3d 588, 598 (2007) ("A reservation of rights should be a factor to consider in determining whether a party has taken an inconsistent position in an earlier proceeding"). Therefore, in light of Mitchell's testimony qualifying ComEd's proposal, we cannot find estoppel here.

Nevertheless, a problem remains for ComEd. As the Commission points out, its original concerns centered on ComEd's choice to fund the pension plan by an equity contribution rather than through some less expensive alternative. The Commission's initial order was correct in finding ComEd's failure to carry its burden of proving its position. Contrary to ComEd's assertion that the Commission "made no finding that the $803 million capital investment was unreasonable or imprudent," it expressly found that ComEd was not excused from proving the reasonableness of the expenditure and that ComEd did not carry this burden. This evidentiary ruling finds substantial support in the record, and thus it was not erroneous. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 352 Ill. App. 3d 630, 639 (2004) ("While decisions of the Commission must be supported by substantial evidence, that standard may be met even if the evidence supports more than one possible conclusion"). The additional evidence proffered by ComEd on rehearing was directed at proving the suitability of one of the three alternatives it advanced at that time. The Commission accepted ComEd's proofs with regard to the third alternative. The third alternative was less expensive than the method ComEd used to fund the pension plan. The Commission disallowed any recovery beyond what the third alternative would have cost. In essence, ComEd initially failed to carry its burden and subsequently did carry its burden to the extent of the costs represented by the third alternative. During oral argument, ComEd asserted that there was evidence that would support a finding that it was reasonable for ComEd to fund the plan in the manner that it did. However, that evidence is not so compelling that the Commission was required to accept it. Resolution of such evidentiary matters is for the Commission. We certainly cannot say that the Commission erred or that its decision was not supported by the substantial evidence that ComEd submitted on the alternatives.

In sum, though we do not find ComEd estopped from challenging the Commission's decision on this issue, the evidence set forth by ComEd in support of its alternative requests was sufficient to allow the Commission to accept it. In light of the state of the record and the standard of review that applies, we find no error in the decision of the Commission.

Ultimately, we find neither of ComEd's arguments sufficiently persuasive to disturb the decision of the Commission. This concludes our discussion of the issues ComEd raises in its portion of this appeal. We now turn to the issues concerning rate structure raised by the remaining parties to this appeal.

## B. RIDER 25

■ The Building Owners and Managers Association of Chicago (BOMA) challenges the elimination of a provision known as Rider 25. Rider 25 established a preferential rate for certain consumers of electricity used for space-heating purposes. The purpose of Rider 25 was to encourage the usage of electricity during off-peak months to balance them with high-usage months (namely, those when air conditioning is widely used) so that ComEd's power plants would continue to operate at peak efficiency throughout the year. BOMA points out that numerous building owners have equipped their buildings with electric space heaters in reliance on Rider 25 and that replacing current heating systems with nonelectrical systems would be prohibitively expensive. It contends that the elimination of Rider 25 would thus result in "rate shock." The Commission questions whether such "rate shock" is a sufficient reason to subsidize one customer class by shifting costs to others. ComEd (which has filed a response in support of the Commission's decision) points out that it no longer owns generation facilities and that its costs of delivering electricity do not vary seasonally, undermining the rationale for the continuation of Rider 25. BOMA counters that ComEd has improperly abandoned this service, in contravention of certain provisions of the Act. The Commission replies that Rider 25 is not a service at all, but a rate structure.

Central to the resolution of this issue is the meaning of section 16—103(a) of the Act. That section provides as follows:

> "An electric utility shall continue offering to retail customers each tariffed service that it offered as a distinct and identifiable service on the effective date of this amendatory Act of 1997 until the service is (i) declared competitive pursuant to Section 16—113, or (ii) abandoned pursuant to Section 8—508. Nothing in this subsection shall be construed as limiting an electric utility's right to propose, or the Commission's power to approve, allow or order modifications in the rates, terms and conditions for such services pursuant to Article IX or Section 16—111 of this Act." 220 ILCS 5/16—103(a) (West 2004).

The interpretation of a statute presents a question of law subject to *de novo* review. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 377 (2008). Our primary goal here is to ascertain and implement the will of the legislature. *McTigue v. Personnel Board*, 299

Ill. App. 3d 579, 589 (1998). Generally, the language of the statute itself is the best evidence of the legislature's intent. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 184 (2007). We may not read out of a statute a limitation that the legislature expressed nor may we impose a condition that the legislature did not enact. *McTigue*, 299 Ill. App. 3d at 589. Similarly, it is often stated that a court may not interpret a statute in such a manner as to render any part of it meaningless. *People v. Bartlett*, 294 Ill. App. 3d 435, 439 (1998). However, where the language of a statute is not clear, we may look to extrinsic aids to help us determine the intent of the legislature. See *Vrombaut v. Norcross Safety Products, L.L.C.*, 298 Ill. App. 3d 560, 562 (1998). A statute is ambiguous if it may be reasonably read as expressing multiple meanings. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008). If a statute is ambiguous, we owe considerable deference to an agency charged with implementing it. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152-53 (1983).

BOMA contends that Rider 25 is a "tariffed service" within the meaning of section 16—103(a). Indeed, save for an evidentiary argument, which we will address later, the balance of BOMA's arguments are entirely dependent upon whether the provisions of section 16—103(a) prevent the elimination of Rider 25. ComEd and the Commission contend that they do not. They point out that BOMA's members still receive electricity as they did prior to the elimination of Rider 25. Thus, they reason, service has not been terminated. Instead, they characterize the discontinuance of Rider 25 as a rate change, and they note that the final sentence of section 16—103(a) expressly recognizes the Commission's authority to modify rates. In essence, the Commission states, BOMA has confused "the concepts of 'services' and 'rates.' " We agree with the Commission that the elimination of Rider 25 implicates rates and not services. After all, ComEd continues to supply electricity as it has in the past; the issue is what BOMA's members will pay for that electricity. The determination of whether to modify what BOMA's members will pay is expressly reserved to the Commission, and we cannot read that provision out of the statute (*McTigue*, 299 Ill. App. 3d at 589).

Though we ultimately agree with ComEd and the Commission, there is some support for BOMA's position in the language of the statute. Section 16—103(a) does not, after all, state simply that a utility shall continue to offer "service"; rather, it uses the term "tariffed service" (this choice of language also makes irrelevant ComEd's and the Commission's citation to section 3—115 of the Act (220 ILCS 5/3—115 (West 2004)), which defines "service"). "Tariffed service" is

defined by section 16—102 as "services provided to retail customers by an electric utility as defined by its rates on file with the Commission." 220 ILCS 5/16—102 (West 2004). Since "tariffed service" is defined with reference to rates, a colorable reading of section 16—103(a) is that a utility must continue to provide the physical service and the rate structure as it existed on the effective date of the Act. See 220 ILCS 5/16—103(a) (West 2004).

On the other hand, the last sentence of section 16—103(a) makes the interpretation advanced by ComEd and the Commission compelling. They read the limitation in the first sentence to apply to the actual provision of electricity as opposed to rates. Since the last sentence expressly allows the Commission to alter rates, this interpretation also finds support in the language of the statute. See 220 ILCS 5/16—103(a) (West 2004). If the first sentence is read essentially to create a rate freeze, how can the Commission modify rates, as the last sentence permits? Accordingly, ComEd and the Commission as well as BOMA advance constructions of section 16—103(a) that are reasonable.

Where, as here, a statute is susceptible to multiple reasonable interpretations, it is ambiguous. See *Thompson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 379 Ill. App. 3d 498, 503 (2008). Under such circumstances, we generally would defer to the Commission, as the agency charged with administering the Act. *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152-53. However, as BOMA pointed out in oral argument, the Commission did not expressly address this issue in its order. The Commission notes in its brief that this is not surprising, since BOMA did not raise this issue until after the Commission issued its order. Absent an interpretation by the Commission to defer to, our next step is to apply the ordinary principles of statutory construction to resolve the ambiguity. Here, it is apparent that the construction advanced by ComEd and the Commission comports with ordinary principles of statutory construction, whereas BOMA's position does not.

It is well established that a statute should be construed so that no part is rendered meaningless. *Rodriguez v. Illinois Prisoner Review Board*, 376 Ill. App. 3d 429, 435 (2007), quoting *People v. McClure*, 218 Ill. 2d 375, 382 (2006). Construing the first sentence of section 16—103(a) to limit the Commission's ability to alter rates would make the last sentence of that section, which reserves that power to the Commission, meaningless. On the other hand, giving effect to the last sentence raises no conflict with the first sentence so long as the first sentence is construed to apply to the actual provision of electrical service. The Commission's construction thus comports with this

principle of statutory construction. See *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 524 (2006) ("We must construe the statute so that each word, clause, and sentence is given a reasonable meaning and not rendered superfluous, avoiding an interpretation that would render any portion of the statute meaningless or void"). Accordingly, we agree with the Commission and ComEd and hold that their construction of section 16—103(a) is the correct one. BOMA raises several subsidiary arguments, such as whether services under Rider 25 have been declared competitive or properly abandoned. Since we have determined that section 16—103(a) does not apply to rate changes, these arguments need not be addressed further.

However, before proceeding further, we must address an argument raised by BOMA in its reply brief. There, BOMA acknowledges that section 16—103(a) would expressly allow for the modification of rates under Rider 25. Nevertheless, it persists in asserting that Rider 25 cannot be eliminated and replaced by a different set of rates. Accepting BOMA's reasoning, the Commission could not eliminate Rider 25 in favor of some other rate structure, but it could alter Rider 25 so that it mirrored that other rate structure. The Commission could accomplish what it has set forth in the current order, but only if it called its action a change in Rider 25 rather than a new rate structure that replaces it. This position elevates form over substance, and we can perceive no reason why the Commission would lack the authority to eliminate Rider 25 when it could arrive at an identical result, from a substantive standpoint, in a different manner. It is well established that we must avoid construing a statute in such a way that an absurdity results. See, *e.g.*, *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 48 (2008) ("Courts should construe a statute in a way that avoids absurd, unreasonable, unjust or inconvenient results"); see *In re Mary Ann P.*, 202 Ill. 2d 393, 406 (2002).

BOMA also contends that the Commission's decision is not supported by substantial evidence. BOMA contends that "uncontroverted testimony showed that the nonresidential space heating customers will experience massive rate shock" (though the Commission questioned whether rate shock constitutes a sufficient basis to require the perpetuation of a rate in any circumstance, we will accept for the sake of argument that such a circumstance could exist). BOMA next asserts that ComEd admitted that "after decades of buildings being constructed in reliance on the separate rate treatment provided under Rider 25, it would be prohibitively expensive for buildings to switch to energy sources other than electricity for heating." Though BOMA does not mention the theory, the contentions it makes are suggestive

of the doctrine of promissory estoppel. See *Kulins v. Malco, a Microdot Co.*, 121 Ill. App. 3d 520, 527 (1984) (explaining that promissory estoppel is "an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct"). To succeed on this theory, a party must show: (1) an unambiguous promise; (2) reliance on the promise; (3) this reliance was expected and foreseeable by the promisor; and (4) the promisee's reliance on the promise was detrimental. *Ross v. May Co.*, 377 Ill. App. 3d 387, 393 (2007). While BOMA mentions detrimental reliance, it does not address all of the elements necessary for it to prevail on a promissory estoppel claim. Notably, it makes no attempt to show that its members' reliance upon the perpetual continuance of Rider 25 was reasonable under the circumstances. In any event, we do not believe it could have made such a showing. In *New Heights Recovery & Power, LLC v. Bower*, 347 Ill. App. 3d 89, 92 (2004), the First District of the Appellate Court held that there is no protected interest in the continuation of a favorable utility rate. Similarly, in *Governor's Office of Consumer Services v. Illinois Commerce Comm'n*, 242 Ill. App. 3d 172, 193 (1992), the First District, confronted with a group of natural gas customers who had been provided standby services cost-free, observed, "A recipient of such a benefit cannot complain if such a benefit is discontinued." Long ago, our supreme court wrote, "The recipient of the benefit of a preferential rate designed to increase off-peak demand has no cause for complaint if it is discontinued." *Antioch Milling Co. v. Public Service Co. of Northern Illinois*, 4 Ill. 2d 200, 208 (1954). In the instant case, BOMA's members have been receiving a benefit designed to balance out the consumption of electricity throughout the year. In light of this long-standing case law, it is difficult to conceive of how BOMA's members' alleged reliance on the indefinite continuation of Rider 25 would have been reasonable. BOMA's contentions about detrimental reliance are therefore insufficient for it to prevail here.

Finally, BOMA's contentions notwithstanding, there is ample support in the record for the Commission's decision. It is undisputed that ComEd no longer owns any facilities that generate electricity, so the end-use characteristics of its customers do not affect its costs of providing delivery service. Paul Crumrine, ComEd's director of regulatory strategies and services, explained that the use to which a customer puts electricity makes no difference to a company that provides only delivery service. The facilities have to be in place regardless of whether they are being used at any given time. The Commission held that it should deviate from cost-based rate design only in the face of significant public policy considerations. Regarding Rider 25, it could

find no such considerations. BOMA also contends that ComEd did not put forth any evidence regarding "the cost of delivery service to nonresidential space heating customers." During oral argument, BOMA repeatedly asserted that a cost study should have been conducted to determine the true cost of providing electricity to space-heating customers as opposed to other customers. However, Crumrine testified that "[t]here is no need to present a separate cost analysis with respect to distribution costs for customers that use electricity for space heating." This is because costs do not vary with end use; they are the same for any consumer of electricity. The Commission was entitled to accept this testimony. In sum, the Commission's decision is supported by substantial evidence.

Therefore, we affirm this portion of the Commission's decision. Section 16—103(a) does not divest the Commission of its usual power to set rates; BOMA has not set forth a full argument regarding promissory estoppel; and the Commission's decision is adequately supported by the record. BOMA makes a brief argument that any increase in rates to which it is subjected should be proportional to increases for other customers. However, this argument is undeveloped and unsupported by authority, and we will not consider it. See *Canteen Corp. v. Department of Revenue*, 123 Ill. 2d 95, 111 (1988) ("A court of review is entitled to have the issues clearly defined and to be cited pertinent authority").

## C. THE CTA AND METRA APPEALS

■ ComEd has been providing service to the CTA and Metra (the Railroads) under two similar contracts. Both contracts have been in place for considerable periods of time, and they comprehensively define the relationships between the respective parties. At issue in this portion of the present appeal are two costs that the Commission's order permits ComEd to recover. First, the Railroads contest the Commission's order to the extent that it allows ComEd to recover construction costs of certain new supply facilities. Second, they complain of the Commission's decision to allow ComEd to impose charges for reserving capacity within its distribution system, as implemented by Rider NS, to accommodate the Railroads' need for an automatic load transfer service to provide electricity if something disrupts the main supply line. The Railroads contend that these charges are inconsistent with the contracts under which they and ComEd have been operating. They argue that their rights under the contract clauses of the state and federal constitutions have been violated (see U.S. Const., art. I, §10;

Ill. Const. 1970, art. I, §16).[1] The Railroads further argue that the rate approved by the Commission was not sufficiently definite to satisfy the publication requirements of section 9—102 of the Act. See 220 ILCS 5/9—102 (West 2004). Finally, Metra asserts that the Commission lacked authority under the Act to enter this order and that, in any event, its order was not supported by substantial evidence.

The contracts at issue provide, in pertinent part, that ComEd is required to provide and maintain facilities to supply electricity up to the point that each Railroad would receive delivery and that each Railroad is responsible for building and maintaining its respective system beyond that point. The Railroads have numerous substations scattered across their operating areas. Previously, in accordance with the contracts, ComEd provided supply facilities leading to each substation. Individual substations were, in essence, treated as individual customers, which meant that the Railroads were responsible for nonstandard service only beyond each substation. Under the Commission's order, the relevant portion of which is known as Rate BES-RR, each Railroad would be entitled to a single point of supply (like most consumers of electricity) and then be responsible for the cost of distributing electricity from that single point to its various substations. Each Railroad's single point of supply is, however, theoretical, since the Railroads in fact receive electricity at their various substations.

The Railroads also contest the Commission's decision as it pertains to reserved-capacity costs. Substations have an automatic switching capability that allows them to change to a different feeder line if the one usually serving them experiences an outage. In addition to paying the physical costs of the facility, ComEd contends that it must reserve

---

[1]Though it has not yet been addressed directly, we perceive no reason to interpret these state and federal constitutional provisions differently. Our supreme court has observed, "If we find in the language of our constitution, or in the debates or committee reports of the constitutional convention, an indication that a provision of our constitution is intended to be construed differently than similar provisions of the Federal Constitution, then this court should not follow or be bound by the construction placed on the Federal constitutional provision." *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209, 213 (1988). The federal provision protecting contractual relationships from governmental interference states, "No State shall *** pass any *** Law impairing the Obligation of Contracts." U.S. Const., art. I, §10. Our state constitution provides, "No *** law impairing the obligation of contracts *** shall be passed." Ill. Const. 1970, art. I, §16. The language used in these two provisions is virtually identical. Hence, we will apply them in a like manner. The parties suggest no reason why we should proceed otherwise.

capacity within its system to meet the demand of the backup line should the primary one be disrupted. Reserved-capacity costs represent the costs of building and maintaining a system capable of handling extra capacity to make available to the Railroads should the automatic load transfer systems activate. In its order on rehearing, the Commission noted that "real costs, other than the costs of interconnection, may be incurred in providing automatic load transfer service." The order specified that ComEd was allowed to assess reserved-capacity charges only when an automatic load transfer system impacted upon its ability to provide safe and reliable service to other customers such that ComEd was required to construct additional facilities. In such cases, the Commission ordered, the "capacity reservation charges shall be based on the cost of constructing the additional facilities." If ComEd does not construct any additional facilities, the customer is entitled to a full refund of the charge. The order forbids ComEd from imposing reserved-capacity charges where an automatic load transfer system had no impact on ComEd's ability to serve other customers that were also served by a given feeder line. The Commission concludes this portion of the order by stating, "Nothing in this conclusion shall impact the terms and conditions of existing contracts between ComEd and individual customers."

We will begin our analysis with the Railroads' contention that the Commission's order results in an unconstitutional impairment of their respective contracts with ComEd. See U.S. Const., art. I, §10; Ill. Const. 1970, art. I, §16. In analyzing a contract clause claim, a court must consider the following four factors: whether a contractual obligation exists; whether governmental action has impaired that obligation; whether the impairment of the contract is substantial; and whether the government action serves an important public purpose. *Kaufman, Litwin & Feinstein v. Edgar*, 301 Ill. App. 3d 826, 837 (1998). The contract clauses notwithstanding, contractual rights remain subject to the police power of the state. *Lincoln Towers Insurance Agency, Inc. v. Boozell*, 291 Ill. App. 3d 965, 968-69 (1997). The state always retains the authority to safeguard the interests of its citizens. *Sanelli v. Glenview State Bank*, 108 Ill. 2d 1, 23 (1985). Put differently, as Justice Oliver Wendell Holmes once observed: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 357, 52 L. Ed. 828, 832, 28 S. Ct. 529, 531-32 (1908). Furthermore, the police power "is not limited to health, morals and safety"; rather, it "extends to economic needs as well." *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38-39, 84 L. Ed. 1061, 1066, 60 S. Ct. 792, 795 (1940).

Additionally, where a contract contemplates the possibility that it will be affected by government action, it cannot be impaired by such action. See *Transport Workers Union of America, Local 290 v. Southeastern Pennsylvania Transportation Authority*, 145 F.3d 619, 622 (3d Cir. 1998) ("The purpose of the Contract Clause is to protect the legitimate expectations that arise from such contractual relationships from unreasonable legislative interference"); *Aves v. Shah*, 914 F. Supp. 443, 447 (D. Kan. 1996) ("The underlying purpose of the contract clause is to protect the expectations of persons who enter into contracts from the danger of subsequent legislation"). Under such circumstances, the parties' expectations cannot be frustrated by government action since they include the possibility of such action. Furthermore, it has been observed that where the parties to a contract are engaged in a heavily regulated industry, that they should be subject to further such regulation should not upset their expectations. See *Veix*, 310 U.S. at 38, 84 L. Ed. at 1065, 60 S. Ct. at 795 ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

ComEd and the Commission flatly assert that regulatory ratemaking does not implicate the contract clause of either the state or the federal constitution (U.S. Const., art. I, §10; Ill. Const. 1970, art. I, §16). We agree. As long ago as 1919, the United States Supreme Court, in *Union Dry Goods Co. v. Georgia Public Service Corp.*, 248 U.S. 372, 375, 63 L. Ed. 309, 311, 39 S. Ct. 117, 118 (1919), regarded this issue as "so settled as not to merit further discussion." In that case, an electric company and a customer had been operating for two years under a contract that set rates for electrical service. The customer refused to pay a bill when the utility attempted to impose a rate greater than that set forth in the contract. The electric company asserted that the rate had been authorized by an order of the Railroad Commission of Georgia (which apparently had jurisdiction over electric utilities at the time). Rejecting a contract clause challenge to the increased rate, the Supreme Court held, "[T]he right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the State." *Union Dry Goods Co.*, 248 U.S. at 377, 63 L. Ed. at 312, 39 S. Ct. at 119; see also *Midland Realty Co. v. Kansas City Power & Light Co.*, 300 U.S. 109, 113, 81 L. Ed. 540, 544, 57 S. Ct. 345, 346-47 (1937) ("There is here involved no question as to the validity of the rates prior to the passage of the statute. Without expression of opinion, we assume that then the parties were bound by the contract. But the State has power to annul and supersede rates previously established

by contract between utilities and their customers"); *Producers' Transportation Co. v. R.R. Comm'n*, 251 U.S. 228, 232, 64 L. Ed. 239, 242, 40 S. Ct. 131, 133 (1920) ("That some of the contracts before mentioned were entered into before the statute was adopted or the order made is not material. A common carrier cannot by making contracts for future transportation or by mortgaging its property or pledging its income prevent or postpone the exertion by the State of the power to regulate the carrier's rates and practices. Nor does the contract clause of the Constitution interpose any obstacle to the exertion of that power"). *Union Dry Goods Co.* and other similar case law from the Supreme Court compel the same result here. The Commission's authority to set rates is not limited by the fact that ComEd and the Railroads have previously entered into contracts.

In a similar case that arose in this state, our supreme court held, "All contracts, whether made by the State itself, by municipal corporations or by individuals, are subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the police power, and do not, by reason of the contracts clause of the Federal constitution, enjoy any immunity from such legislation." *Hite v. Cincinnati, Indianapolis & Western R.R. Co.*, 284 Ill. 297, 299 (1918). Likewise, the supreme court later held, "The contract being subject to legislative control, the intervention of the State, either on behalf of the public utility to secure a reasonable return for the service rendered or of the city to cause a reduction of rates which have become excessive, does not abrogate a contract, of which the law is an integral part." *Chicago Rys. Co. v. City of Chicago*, 292 Ill. 190, 201-02 (1920). Undoubtedly, in this case, the "law is an integral part" of the contracts. The contract between ComEd and the CTA includes the following provision:

> "This agreement is entered into on behalf of [ComEd] subject to approval by the Illinois Commerce Commission and shall be subject to modification by proceedings before such Commission to the same extent and upon the same grounds as any filed rate of general applicability."

ComEd's contract with Metra contains a provision that is virtually identical:

> "This agreement is entered into on behalf of Metra and [ComEd] subject to approval by the Illinois Commerce Commission and shall be subject to modification by proceedings before such Commission to the same extent and upon the same grounds as any filed rate of general applicability."

Indeed, aside from any question about constitutional limitations on the Commission's authority to alter a contract between these parties,

the contracts themselves expressly recognize the authority of the Commission to modify the agreements. As action by the Commission is consistent with these provisions, it is difficult to discern how action by the Commission can be said to impair the contracts under these circumstances. See also *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 56 (2004), (" 'Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed' "), quoting *Western Union Telegraph Co. v. Esteve Brothers & Co.*, 256 U.S. 566, 571-72, 65 L. Ed. 1094, 1097-98, 41 S. Ct. 584, 586 (1921); *H. Miller & Sons, Inc. v. Hawkins*, 373 So. 2d 913, 914-15 (Fla. 1979) (Florida Public Service Commission could impose rate increase despite private contract between utility and customer). Moreover, any expectations on the part of the Railroads to the contrary were simply unreasonable. See *Veix*, 310 U.S. at 38, 84 L. Ed. at 1065, 60 S. Ct. at 795.

Metra complains that, in the past, the usual practice by which the contract was altered was that ComEd would file an amendment to the contract after the conclusion of a general rate case. This may be true, and it is also true that a course of performance may, in certain circumstances, supplement a contract. See *Berryman Transfer & Storage Co. v. New Prime, Inc.*, 345 Ill. App. 3d 859, 865 (2004). Metra does not attempt to show that such circumstances are present here. For example, course of performance does not control over the express terms of a contract. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 673 (2007). Since the express terms of the contract make it subject to action by the Commission, it is not clear to us how the course of performance referred to by Metra could be taken into account in interpreting the contract. Moreover, this argument says nothing about the Commission's power to alter the contract. The question before us does not concern ComEd's rights and duties under the contract; it concerns the authority of the Commission. In any event, as this argument is largely undeveloped, we will not consider it further. See *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) (holding a "reviewing court is entitled to have issues clearly defined with relevant authority cited"). The same is true of the CTA's assertion that, had the parties contemplated a reallocation of costs of construction projects, "one would logically expect that [the] parties would negotiate such a cost re-assignment."

Metra contends that ComEd improperly attempts to characterize this as a rate case when it is in fact about nonrate issues, such as the

allocation of construction costs. Likewise, the CTA contends that the Commission does not have statutory jurisdiction over this case, as it does not pertain to rates. These contentions are not well founded. Initially, we note that "rate" is defined in the Act in the following manner:

" 'Rate' includes every individual or joint rate, fare, toll, charge, rental or other compensation of any public utility or any two or more such individual or joint rates, fares, tolls, charges, rental or other compensation of any public utility or any schedule or tariff thereof, and any rule, regulation, charge, practice *or contract relating thereto*." (Emphasis added.) 220 ILCS 5/3—116 (West 2004).

These contracts relate to rates because of the way rates are calculated. Recall that, in a rate case, the Commission must determine a utility's revenue requirement. *City of Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 627 (1996). The revenue requirement consists of the sum of the utility's operating costs and the rate of return on invested capital. *City of Chicago*, 281 Ill. App. 3d at 627. Whether treated as operating costs or as an investment of capital, expenditures by ComEd on new facilities to serve the Railroads, as well as the costs of maintaining those facilities, would be included in ComEd's revenue requirement. Thus, even if ComEd's actual expenditures pertain to construction, they would be recovered through ratemaking. Since a "contract relating thereto" is included in the definition of "rate" (see 220 ILCS 5/3—116 (West 2004)), the contracts between the Railroads and ComEd are, to the extent that they relate to rates, considered under section 3—116 of the Act to be rates themselves. They are therefore within the scope of the Act as well as the jurisdiction of the Commission.

In sum, the law is well established. Regulatory ratemaking does not implicate the contract clauses of the state and federal constitutions (U.S. Const., art. I, §10; Ill. Const. 1970, art. I, §16), and the ability to set rates remains within the police power of the State, and, more specifically, the Commission. Accordingly, we must reject the Railroads' contentions that the Commission's actions worked an unconstitutional impairment of their contracts with ComEd. Moreover, having recognized the Commission's power to modify such contracts, any arguments regarding the construction of the contracts or ComEd's duties under the contracts do not compel a different result.

We will next address the Railroads' arguments that the provisions of Rider NS (which authorizes the reserved-capacity charges) are so indefinite that they do not satisfy the publication requirements of section 9—102 of the Act (220 ILCS 5/9—102 (West 2004)). That section provides, in pertinent part, as follows:

"Every public utility shall file with the Commission and shall print and keep open to public inspection schedules showing all rates and other charges, and classifications, which are in force at the time for any product or commodity furnished or to be furnished by it, or for any service performed by it, or for any service in connection therewith, or performed by any public utility controlled or operated by it. Every public utility shall file with and as a part of such schedule and shall state separately all rules, regulations, storage or other charges, privileges and contracts that in any manner affect the rates charged or to be charged for any service." 220 ILCS 5/9—102 (West 2004).

This provision does not prohibit the Commission from setting a variable rate keyed to some external measure. See *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 611 (1958) ("[I]t is clear that the statutory authority to approve rate schedules embraces more than the authority to approve rates fixed in terms of dollars and cents"); *Citizens Utility Board v. Illinois Commerce Comm'n*, 275 Ill. App. 3d 329, 339-40 (1995).

The Railroads rely heavily on *Citizens Utility Board*, 275 Ill. App. 3d 329, in support of their positions. In that case, the First District of this Appellate Court struck down a rate the Commission had approved for, *inter alia*, failing to comply with section 9—102 of the Act. *Citizens Utility Board*, 275 Ill. App. 3d at 339. The rate in question—known as Rate CS—allowed ComEd to negotiate a rate with existing large customers that were contemplating switching to a different source of energy, in order to retain them as customers. The only limitation upon ComEd's ability to set a rate was that it could not be discounted to the point that it was below the incremental cost of providing service to the customer in question. The court found that this did not constitute a rate at all. *Citizens Utility Board*, 275 Ill. App. 3d at 339. Rather, Rate CS merely permitted ComEd to set rates in the future. *Citizens Utility Board*, 275 Ill. App. 3d at 339. Since no rate existed at the time ComEd filed its tariff, ComEd could not have complied with section 9—102 of the Act. *Citizens Utility Board*, 275 Ill. App. 3d at 339. As the court put it, "In other words, the alleged 'rate' in Rate CS is simply any rate [ComEd] eventually chooses provided [that] the company does not, in laymen's terms, lose money." *Citizens Utility Board*, 275 Ill. App. 3d at 339.

Rider NS allows ComEd to recover costs associated with reserving capacity for the Railroads' automatic load transfer systems. These charges could include construction costs of a second feeder line, costs of switching equipment, and costs of additional delivery facilities to handle the additional capacity. The Commission directed ComEd to

incorporate a formula from another rider (Rider DE), which provides a detailed mathematical formula for determining—for the purpose of ratemaking—the costs of facilities being installed to service the Railroads. The Railroads point out that nowhere in the Commission's order is it specified how much capacity is to be reserved and what facilities are to be constructed. The order limited the recovery of such costs to situations where the construction of additional facilities was necessary to provide "safe and reliable service" to other customers on the same feeder. Also, if ComEd imposes charges but does not construct facilities in a timely manner, the customer is entitled to a full refund. The Railroads complain that neither "safe and reliable" nor "timely manner" is defined in the order.

Rider NS, as described, bears little similarity to the rider at issue in *Citizens Utility Board*, 275 Ill. App. 3d 329; therefore, that case is distinguishable. Most importantly, in *Citizens Utility Board*, ComEd had unbridled discretion to set any rate, so long as it covered its marginal costs of providing the service in question. Here, ComEd has virtually no unguided discretion. Actual construction costs are determined by a formula borrowed from Rider DE. ComEd may build new facilities only to the extent that it needs them to provide "safe and reliable" service. That these terms cannot be defined with mathematical certitude does not persuade us that ComEd could embark on any construction project it wished and pass the costs along to the Railroads. *Cf. Duffy v. Grogan Enerserv Corp.*, 708 P.2d 809, 810-11 (Colo. App. 1985) (holding the phrase "good and *safe* operating condition" did not render contract ambiguous (emphasis added)); *Central Louisiana Electric Co. v. Dolet Hills Mining Venture*, 116 F. Supp. 2d 710, 720 (W.D. La. 1999) ("[Plaintiff's] interpretation would be inconsistent with the parties' clear intent to establish a stable and *reliable* supply relationship" (emphasis added)); *State of Louisiana, Department of Labor v. United States Department of Labor*, 108 F.3d 614, 618 (5th Cir. 1997) ("The plain language of 29 U.S.C. §1575(a)(1) is unambiguous, requiring all recipients to maintain accurate and *reliable* records" (emphases added and omitted)). Conversely, in *Citizens Utility Board*, ComEd could have set any rate it wished, assuming it did not wish to actually lose money. Nor are we persuaded that the term "timely" or any other term used in the Commission's order is so vague as to vest ComEd with a great amount of discretion. Analogously, we note that the use of such a term in a contract does not make the contract sufficiently indefinite as to be unenforceable. In *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1091-92 (2003), the First District of our Appellate Court held that where a time for performance is not specified in a contract, "a reasonable time will be implied." That,

however, did not render the contract at issue unenforceable. *Rose*, 343 Ill. App. 3d at 1092. We perceive no meaningful difference between "a reasonable time" and the "timely manner" as articulated in the Commission's order. Moreover, we note that, under Rider NS, ComEd cannot impose any such charges until a customer requests new or different services. It also states that "the type, extent and location of such nonstandard services and facilities are determined by agreement between [ComEd] and the retail customer."

Ultimately, we find Rider NS to be more like the rate at issue in *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607 (1958). There, our supreme court approved a rider that allowed the rate charged by a vendor of natural gas to fluctuate according to its costs of obtaining the gas on the wholesale market. *City of Chicago*, 13 Ill. 2d at 612-13. Similarly, the rate ComEd is permitted to charge is keyed to its costs of building new facilities. We recognize that the instant case requires ComEd to make some decisions regarding what new facilities are necessary. That, however, is a far cry from absolute discretion to set a rate, and it does not meaningfully distinguish *City of Chicago*. We therefore hold that Rider NS does not violate section 9—102 of the Act.

Finally, we come to Metra's contentions that the Commission exceeded its authority in allowing ComEd to recover future construction costs and that, in any event, its order doing so does not have a substantial foundation in the evidence. Metra's evidentiary arguments focus on the meaning of the contract. Since, as we have previously explained, setting utility rates is within the police power of the state, the Commission has the authority to alter a contract such as those at issue here. *City of Champaign v. Illinois Commerce Comm'n*, 209 Ill. App. 3d 1070, 1075-76 (1991) ("The Commission is a legislative agency created for the purpose of applying the numerous details of regulatory police power over public utilities. The legislature has vested in the Commission the function of fixing rates of public utilities which will be just and reasonable and produce a fair return upon the property used and employed in the public service"); see *Chicago Rys. Co.*, 292 Ill. at 195. Thus, the implication that the contract in some way limits the Commission's authority, or that its authority is dependent upon the contract, is misplaced. As such, questions of contractual construction are immaterial.

Metra also argues that section 16—129 of the Act prohibits the Commission from altering its contract with ComEd and that the Commission therefore exceeded its authority. That section states, in relevant part:

"Nothing in this Article XVI shall affect the right of an electric utility to continue to provide, or the right of the customer to continue to receive, service pursuant to a contract for electric service between the electric utility and the customer, in accordance with the prices, terms and conditions provided for in that contract. Either the electric utility or the customer may require compliance with the prices, terms and conditions of such contract." 220 ILCS 5/16—129 (West 2004).

The "Article XVI" referred to in this passage is the Rate Relief Law (220 ILCS 5/16—101 *et seq.* (West 2004)).

In interpreting a statute, our goal is always to ascertain and give effect to the intent of the legislature. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). The best indicator of that intent is, of course, the plain language of the statute. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 26 (2005). When the language of a statute is clear, a court will not resort to other aids of construction. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). It is well established that we may not read into a statute any conditions or provisions that the legislature did not express. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 350-51 (1998). Applying those principles here, we find Metra's argument misplaced.

Metra reads section 16—129 as imposing a limitation on the Commission's power to regulate utility rates. However, nowhere in this statute is the Commission even mentioned. All that is stated in section 16—129 is that article 16 of the Act leaves any existing contractual arrangements intact. It says nothing whatsoever about the Commission's authority to alter them. As we discussed earlier, the Commission's power to set utility rates is well established and flows from the police power of the state. It would be odd indeed for the legislature to intend to abrogate this long-standing power without even mentioning the Commission. In turn, it would be improper for us to give section 16—129 such an expansive reading. We cannot read into a statute a condition that is not there. *Ragan*, 183 Ill. 2d at 350-51. In short, the plain language of the statute does not limit the Commission's authority over utility rates. Moreover, as ComEd pointed out during oral argument, both contracts contemplate modification by the Commission, so the fact that they were modified by the Commission does not violate this provision of the Act, assuming it does require the contracts to remain in effect. Having rejected the final argument advanced by the Railroads, we affirm this portion of the Commission's order.

## IV. CONCLUSION

In light of the foregoing, we affirm the order of the Commission. None of the parties have carried their burden of persuading us that an

error occurred. In all relevant aspects, the Commission neither exceeded its authority nor violated any party's constitutional rights. Its decision was supported by substantial evidence in the record, and the findings it made in support of its decision were adequate.

Affirmed.

BURKE and SCHOSTOK, JJ., concur.