The NARRAGANSETT ELECTRIC COMPANY d/b/a National Grid

v.

RHODE ISLAND PUBLIC UTILITIES COMMISSION.

Nos. 2010–142–M.P., 2010–179–M.P.

Supreme Court of Rhode Island.

Jan. 23, 2012.

Gerald J. Petros, Esq., Providence, for National Grid.

Leo J. Wold, Department of Attorney General, for Public Utilities Commission.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

■ On June 1, 2009, National Grid (or the company) filed an application with the Public Utilities Commission (the commission or PUC) in which it sought additional revenues for its electricity distribution operations in Rhode Island.[1] In its filing, the company requested an increase in electric distribution rates sufficient to enable it to collect additional revenues of $75.3 million, an increase of 33 percent.[2] The Division of Public Utilities and Carriers[3] (the division) opposed the company's rate request; it recommended that the PUC reduce the base-rate-revenue requirement sought by the company by $37.82 million. Particular to this case, the company included a proposal to revise its capital structure[4] to include a common equity component of 50.05 percent. In contrast, the division, through the expert testimony of Matthew Kahal, recommended a 47.5 percent common equity component. Also, the company requested a $2.4 million increase in rates to support an incentive compensation plan for certain of its employees; the division recommended that that amount be reduced by half. Finally, the company proposed modifications to its union contract labor expense, storm expenses, outside legal expense, vegetation management, inspection and maintenance expense, as well as rate base additions through the year.[5]

On April 29, 2010, the commission issued a report and order in docket No. 4065. In its decision, the commission reduced the company's increase in its revenue requirement to $15.9 million. In so doing, the commission set the common equity component of the company's capital structure at 42.75 percent. It also reduced by half the company's request to establish a variable pay scheme for certain of its employees. On May 6, 2010, the company petitioned this Court for a writ of certiorari under G.L.1956 § 39–5–1.[6] We issued the writ

1. The company's rate filing was denominated as docket No. 4065 by the commission.

2. Prior to the commission's decision, and during the course of the regulatory process, this request was reduced twice, first to $62.2 million, then to $57.7 million.

3. The division represents the interest of the public in rate cases. In such cases, the Attorney General acts as counsel for the division in all administrative and legal proceedings. *In re Island Hi–Speed Ferry, LLC,* 746 A.2d 1240, 1244 n. 6 (R.I.2000).

4. Capital structure is "[t]he mix of debt and equity by which a business finances its operations." Black's Law Dictionary 238 (9th ed. 2009).

5. The passage of G.L.1956 § 39–1–27.7.1 rendered the company's vegetation management and inspection and maintenance claims moot. Upon filing by the company, the statute affords a reconciliation mechanism to recover those expenses on a prospective basis.

6. General Laws 1956 § 39–5–1 provides for a review by certiorari of all orders made by the PUC:

"Any person aggrieved by a decision or order of the commission may, within seven (7) days from the date of the decision or order, petition the [S]upreme [C]ourt for a writ of certiorari to review the legality and reasonableness of the decision or order. The petition for a writ of certiorari shall fully set forth the specific reasons for which it is claimed that the decision or order is unlawful or unreasonable. Chapter 35 of title 42 shall not be applicable to appeals from the commission. The procedure established by this chapter shall constitute the exclusive remedy for persons and companies aggrieved by any order or judgment of the commission; provided, however, any person aggrieved by a final decision or or-

on May 17, 2010.[7] On October 6, 2011, after thoroughly briefing the issues, the parties appeared before this Court for oral argument. We have carefully reviewed the record, and for the reasons set forth in this opinion, we affirm in part and vacate in part the decision of the commission.

### Regulatory Proceedings

As is the custom in a major rate case, extensive written testimony and voluminous discovery was submitted by National Grid, the division, and several intervenors.[8] The commission reviewed reams of documents, hundreds of pages of transcripts, and listened to eleven days of oral testimony. Moreover, the PUC conducted hearings around the state to solicit public comment. At the conclusion of all the hearings, the parties submitted significant post-hearing memoranda and reply memoranda. On February 9, 2010, the PUC, in an open meeting, voted to authorize a base distribution revenue increase of approximately $16.2 million, an amount far lower than the company's final proposed increase of $57.7 million. Indeed, it was even significantly lower than the division's recommendation.

There are two overarching issues framing our review of this case. First, the company argues that the PUC determined a capital structure that was both unreasonably low and that was not supported by the record. Second, it argues that the PUC erred when it reduced the company's proposal for an incentive based compensation plan by 50 percent.

When it filed its rate case, the company's capital structure was overly reliant on equity, with a ratio of 85.57 percent equity and 14.4 percent debt. It is undisputed that this structure was not reasonable for ratemaking purposes because it would have had a marked impact on electrical rates for consumers.

For this reason, the company aimed to improve the internal balance of its capital structure. To accomplish this goal, the company sought to issue approximately $550 million in long-term debt. This, it anticipated, would reduce the common equity ratio to 50.05 percent, a more appropriate allocation for ratemaking purposes. The company contended that it reasonably expected that its debt issuance would be approved before the new rates went into effect, and therefore it proposed that the commission accept that capital structure as a "placeholder."[9] As expected, the com-

der of the administrator may appeal therefrom to the [S]uperior [C]ourt pursuant to the provisions of § 42–35–15."

7. On April 14, 2010, the PUC issued order No. 19965, setting forth the majority's opinion, and adopting the conclusions reached by the majority at the open meeting. Pursuant to § 39–5–1, National Grid filed a petition for a writ of certiorari on April 20, 2010 seeking this Court's review of order No. 19965. This Court ordered a writ of certiorari on April 28, 2010. On April 29, 2010, the PUC issued order No. 19965A in the same docket, a more detailed report and order with respect to the company's rate application. The company filed a petition for writ of certiorari from that order on May 6, 2010, and that writ issued on May 17, 2010. On the very same day, PUC chairman Elia Germani filed a twenty-seven page opinion dissenting from the PUC's decision in numerous ways. On June 8, 2010, this Court consolidated the two cases. Hereafter, the Court will refer to these two orders collectively as the "decision" or "order."

8. The intervenors included: the Navy, the Rhode Island Attorney General, the George Wiley Center, the Conservation Law Foundation, Environment Northeast, the Energy Council of Rhode Island, and the Energy Efficiency Resource Management Council.

9. The debt issuances of regulated utilities are evaluated and approved by the Division of Public Utilities and Carriers. On March 22, 2010, the company completed its debt refinancing; it formally notified the PUC of the refinancing on March 29, 2010.

mission rejected the company's existing rate structure, featuring 85.57 percent common equity, as unreasonable, but it also declined to accept the proposed capital structure of 50.05 percent as sufficiently firm. The company contends that this was error and that the PUC did not follow its established policy of using the actual capital structure of a utility when that structure is reasonable.

During the hearings before the PUC, the division's expert objected to the use of the company's proposed capital structure because, in his opinion, it represented only a "plan or set of intentions," even though the company and the division had reached an agreement with respect to it.[10] Instead, the division's expert testified that he recommended that the PUC adopt a capital structure for the company that was based on the capital structures of a "proxy group" of similarly situated utilities. In the opinion of the division's expert, a capital structure featuring a 47.5 percent equity ratio was reasonable and appropriate. This, however, also was rejected by the PUC.

On January 12, 2010, the PUC issued a "record request"[11] that inquired about the effect that a 38 percent common equity rate would have on the return on equity. It is telling that the division responded that it had "not conducted a formal analysis of the cost of equity implications" of that type of capital structure. On February 9, 2010, the commission conducted an open meeting, and in the course of that meeting, it decided all the issues that had been presented in docket No. 4065.

At that meeting, the PUC decided that an equity ratio of 42.75 percent was appropriate. It also voted to disallow 50 percent of the variable pay expense requested by the company. The commission relied on the expert testimony of the division's witness, David Effron, who had testified that the attainment of financial goals is a shareholder oriented goal; thereby making shareholders, not ratepayers, the primary beneficiaries of increases to the company's earnings. Effron also testified that when attainment of financial goals benefits shareholders, costs associated with attaining those goals are not proper for inclusion in a utility's revenue requirement, because those costs should not burden ratepayers.

The PUC found the testimony of the company's expert on this issue, William Dowd, to be "unpersuasive in establishing any link between the company's attainment of financial goals and ratepayer benefits." Therefore, because the company was unable to satisfy the PUC that the requested $2.4 million was sufficiently tied to a benefit for ratepayers, it disallowed $1.2 million of the requested increase. It is from these two rulings that the company seeks our review.[12]

## Standard of Review

■ The General Assembly has prescribed the standard of review for cases brought before this Court in accordance with § 39–5–3.

"The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the

10. Indeed, six days later, on November 18, 2009, the company and the division entered into a settlement agreement relating to the refinancing at issue. On December 9, 2009, the division formally approved the agreement. The evidentiary hearings in the rate case before the commission ended the same day.

11. Record requests are discovery mechanisms seeking information from parties before the PUC.

12. Initially, the company petitioned for review on a number of other issues but it has pursued only the capital structure and incentive compensation plan before this Court.

commission and the [S]upreme [C]ourt, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." *Id.*

When we review a decision of the PUC, our mission is to determine "whether the decision of the commission was fairly and substantially supported by legal evidence specific enough to enable us to ascertain if the facts upon which the commission's decision is premised afford a reasonable basis for the result reached." *Newport Electric Corp. v. Public Utilities Commission,* 624 A.2d 1098, 1101 (R.I.1993) (citing *Michaelson v. New England Telephone & Telegraph Co.,* 121 R.I. 722, 404 A.2d 799 (1979)); *see Providence Water Supply Board v. Public Utilities Commission,* 708 A.2d 537, 541 (R.I.1998); *see also* § 39–5–1.

Although it is undisputed that this Court affords great deference to the PUC's decisions, *Providence Gas Co. v. Malachowski,* 600 A.2d 711, 714 (R.I.1991), "if it becomes impossible for us properly to fulfill our assigned function because of the commission's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for supporting evidence or reasons." *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 278, 302 A.2d 757, 763 (1973). "Instead, we will remand the case in order to afford the commission an opportunity to fulfill its obligations in a supplementary or additional decision." *Id.* (citing *United Transit Co. v. Nunes,* 99 R.I. 501, 504–05, 209 A.2d 215, 217–18 (1965); *New England Telephone & Tele-*

*graph Co. v. Kennelly,* 81 R.I. 1, 9–10, 98 A.2d 835, 839 (1953)).

## Analysis

Before us, National Grid assigns two errors in the PUC's order that it contends warrant reversal: (1) the unreasonableness of setting of the common equity component of the capital structure at 42.75 percent, and (2) the disallowance of half the proposed incentive compensation structure.

### A. Capital Structure

When a regulatory agency like the PUC sets the rate of return for a utility, the applicable capital structure of the utility is properly considered. *See Public Service Commission of New York v. Federal Energy Regulatory Commission,* 813 F.2d 448, 458 (D.C.Cir.1987). The capital structure of a company is composed of "the percentages of debt, preferred stock, and common stock[,] and the rate of return each form of capital is permitted to earn." *Id.* (parenthesis omitted). Generally speaking, because equity is more expensive than debt, higher percentages of equity in the capital structure mix will be reflected by higher electric rates. *See* Charles F. Phillips, Jr., *The Regulation of Public Utilities: Theory and Practice,* 388–89 (3d ed. 1993).

The company contends the PUC was unreasonable when it determined a capital structure with a debt-to-equity ratio of 42.75 percent, because the only evidence submitted to the commission during the entire regulatory process was that a reasonable equity component would be within the range of 45–50 percent. The company attacks the PUC's report and order with regard to its capital structure on three fronts. First, the company contends that a reasonable capital structure was sufficiently in place by the time the PUC is-

sued its report and order in this docket. Therefore, it maintains, the PUC should have followed its longstanding precedent of using the utility's actual capital structure in its analysis. Next, the company argues that even if it did not have a reasonable capital structure in place as of the date of the report and order, the commission should have used a proxy group of like utilities, as was suggested by the division's expert, to determine an appropriate common equity percentage. In the end, the commission used the capital structure of the company's twice removed parent, National Grid plc, as a basis for determining an appropriate capital structure. This, the company says, was error because: (1) it was unsupported by and, in fact, contradicted by the record evidence and (2) was inconsistent with the disclosed methodologies previously prescribed by the commission and endorsed by this Court.

### Did the Company have a Capital Structure in Place?

■ The company argues that it had a reasonable capital structure in place by the time the PUC issued its report and order. It does not disagree that the capital structure that existed at the time it filed its rate case was unreasonable for ratemaking purposes, but it maintains that it reasonably expected to complete a refinancing prior to new rates going into effect, and that, therefore, its proposed common equity component of 50.05 percent was based on a capital structure that would be in existence before the commission issued a rate order. The company further maintains that the commission had knowledge of all the details of the refinancing plan at all critical stages of the litigation, and certainly before it issued its decision in the rate case. Thus, it contends, the PUC erred by not following its own well-established protocol of using the actual capital structure of a company whenever that structure is reasonable.

The company concedes that this Court has held that the commission is entitled to require a company seeking rate relief to present "actual and verifiable proof" in order to sustain its general rate filing claims. *See In re Providence Water Supply Board's Application to Change Rate Schedules*, 989 A.2d 110, 117 (R.I.2010). However, it nonetheless insists it has met that standard.

In contrast, the division maintains that the Administrative Procedures Act expressly requires the PUC to base its findings of fact "exclusively on the evidence." G.L.1956 § 42–35–9(g). In its submission to this Court, the division asserts that the company failed to demonstrate or document a sufficiently firm capital structure before the commission decided the issues in the docket. It points out that the division's expert, Mr. Kahal, testified that the company had presented no evidence that the proposed capital structure was what the company would actually use during the rate year, and that the 50 percent common equity proposal may "not actually be achieved." The PUC found that the company failed to timely present "actual and verifiable" evidence of the existence of an actual capital structure. *See In re Providence Water*, 989 A.2d at 117.

We previously have recognized the inherent difficulty that exists in the ratemaking process, and have held that "when known and measurable post-test-year changes affect with certainty the test-year data, the commission *may*, within, its sound discretion, give effect to those changes." *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 416, 368 A.2d 1194, 1207 (1977) (citing *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 393, 322 A.2d 17, 22 (1974) (emphasis added)). We are somewhat concerned by the fact

that the PUC predicated its decision on a finding that the company's refinancing was not definite. This is so because the commission ignored the formal approval of the settlement reached between the company and the division, of which it had timely knowledge.[13]

Notwithstanding our disquiet on this issue, however, the PUC's decision about whether an actual capital structure was in place should be accorded "great deference." *See Roberts v. Narragansett Electric Co.*, 490 A.2d 506, 507 (R.I.1985). In light of this deference, we will not disturb the commission's decision declining to give effect to those changes. *See id.*

## Use of a Proxy

■ Next, the company argues that even if it did not have a reasonable capital structure in place as of the date of the report and order, the commission nonetheless should have used a proxy group of like utilities to determine an appropriate capital structure and common equity percentage. During the rate case, the division objected to what the company offered as its actual capital structure, arguing that it was merely a "plan or set of intentions." As a result, the division's expert suggested an alternate methodology, and he used a proxy group of what he described as "like utilities" to conclude that a reasonable range for the common equity portion of the capital structure would be between 45–50 percent. The division's expert suggested that the common equity component of the capital structure be set at 47.5 percent,

the mid-point of what he opined was the reasonable range. The company agrees that this methodology is generally accepted, and it cites to a number of prior PUC decisions to support the argument that the longstanding practice of the commission is to impute the capital structure of a proxy group of like utilities if no reasonable capital structure exists with regard to the utility under review.

Although we agree that the use of a proxy group is an acceptable methodology, we will not second-guess the commission's decision to decline to embrace the proxy group offered here.[14] This is an example of the required complex socioeconomic and technical knowledge possessed by the commission that requires that we accord a deferential review to its decisions. *See In re Island Hi–Speed Ferry, LLC*, 746 A.2d 1240, 1246 (R.I.2000). In our opinion, the company has failed to overcome, by "clear and convincing evidence," the presumption that the ruling of the commission on this issue was reasonable. *See In re Kent County Water Authority Change Rate Schedules*, 996 A.2d 123, 133 (R.I.2010). Accordingly, we will not substitute our judgment for that of the commission on the issue of the use of proxy groups to establish the proper common equity component of the company's capital structure. *See Pine v. Malachowski*, 659 A.2d 674, 676 (R.I.1995).

## The Capital Structure of the Parent Company

■ Lastly, the company asserts that making use of the capital structure of Na-

---

13. Although the commission discounted the division's formal approval of the debt issuance on December 9, 2009, it nonetheless used a response to record request 44, dated November 12, 2009, to impute the capital structure of the company's parent corporation.

14. We are somewhat perplexed by the fact that, although it spurned the proxy group offered by the division's witness to set the common equity portion of the capital structure, the PUC did not hesitate to later use that same percentage recommended by the witness to average it with the common equity percentage of National Grid's parent company, National Grid plc.

tional Grid plc was: (1) unsupported and in fact contradicted by the record evidence and (2) inconsistent with the methodologies previously prescribed by the commission and endorsed by this Court.

Conversely, the division argues that there is "ample legal and regulatory authority * * * to support the commission's use of a parent holding company's consolidated capital structure to derive a subsidiary utility's common equity percentage." The division cites several cases and PUC orders to support this proposition. However, only one Rhode Island case was cited by the division to support its argument, and that case is starkly distinguishable from the circumstances before us, because there the PUC applied a "complex theory known as 'double leveraging.'" *Bristol County Water Co. v. Harsch,* 120 R.I. 223, 238, 386 A.2d 1103, 1112 (1978). That process was not employed here.

In *Bristol County Water,* 120 R.I. at 239, 386 A.2d at 1112, we affirmed the PUC's use of a parent holding company's consolidated capital structure to formulate the capital structure of Bristol County Water. It is significant, however, that in that case there was ample evidence on the record about Bristol County Water's parent company, American Water Works Company, Inc. (American), as well as in-depth information about American Water Works Service Company, another wholly owned subsidiary of American, that provided technical services to Bristol County Water. *Id.* at 224–25, 386 A.2d at 1104–05. Finally, evidence was presented about the precise business in which American

was engaged in, along with evidence of American's consolidated assets. *Id.*

It is important to note that in *Bristol County Water,* 120 R.I. at 233, 386 A.2d at 1109, the division's expert testified that the proposed adoption of a parent company's capital structure "demanded an in-depth evaluation of Bristol County Water's position within the corporate structure." The expert testimony also advised the PUC to "view [the parent holding company] and its subsidiaries as an 'integrated entity'" and "unless the commission was particularly vigilant, [the parent company's] corporate network could well 'mask the economic realities of the situation.'" *Id.* at 234, 386 A.2d at 1109.

That type of searching analysis is notably absent in this case. National Grid plc, the twice removed parent of the company, is a European corporation based in the United Kingdom, unlike the United States-based parent holding company in *Bristol County Water.*[15] *See Bristol County Water,* 120 R.I. at 224–25, 386 A.2d at 1104–05. The only "evidence"[16] in the record about this foreign corporation was that it was 95 percent regulated, and 5 percent unregulated. That information came in the form of a single record request elicited by the PUC itself:

"*Request:*
What is the capital structure of National Grid plc, with all adjustments made to account for cash assets, RAV, etc.? What percentage of National Grid plc operations are unregulated?
*Response:*
National Grid plc's capital structure as of March 31, 2009, determined in accor-

---

**15.** The immediate parent of the company is National Grid USA, which is itself a wholly owned subsidiary of National Grid plc.

**16.** This information was elicited through data and record requests. Rule 1.18(c)(6) of the State of Rhode Island Public Utilities Com-

mission's Rules of Practice and Procedure, states "[d]ata requests and responses, though part of the docket, are not evidence unless admitted during a hearing, or by consent of the parties."

dance with U.S. GAAP and adjusted for cash assets and RAV is comprised of approximately 38 percent common equity and 62 percent debt. Only five percent of National Grid plc's operations are [un]regulated." [17]

■ Apposite from *Bristol County Water*, there was utterly no evidence in the record about the services the immediate parent company, National Grid USA provided, or precisely what services National Grid plc provided in the United Kingdom or around the globe. *See Bristol County Water*, 120 R.I. at 224–25, 233–34, 386 A.2d at 1104–05, 1109. No expert testified about the propriety of considering the structure of this parent holding company, nor was there any in-depth evaluation about where National Grid fit within the corporate structure of National Grid plc. *See id.* at 224–25, 386 A.2d at 1104–05. Finally, no witness testified about viewing National Grid plc and National Grid USA or National Grid as an "integrated entity." *See id.* at 233, 386 A.2d at 1109. While it is true that public utilities commissions are not required to support their selection of a methodology with expert testimony, the commission must nonetheless "set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions * * *." *Rhode Island Consumers' Council*, 111 R.I. at 278, 302 A.2d at 763; *accord Wakefield Water Co. v. Public Utilities Commission*, 457 A.2d 251, 253 (R.I. 1983). Thus, without any development of the issue on the record, the lack of factual basis for using the capital structure of National Grid plc "could well 'mask the economic realities of the situation.'" *Bris-*

*tol County Water*, 120 R.I. at 234, 386 A.2d at 1109.

We have reviewed the other authority cited by the division to support its argument, but, in our opinion, the cases cited either are factually distinguishable or are not persuasive. In *Public Service Commission of New York*, 813 F.2d at 458, the court examined the propriety of using the capital structure of a parent company. But in that case, it was the wholly owned subsidiary itself, which had no independent corporate existence, that proposed using the capital structure of its parent company. *Id.* at 458–59. Furthermore, issues underlying the policy of using the parent company's capital structure including "the relative risks facing a pipeline division and its diversified parent corporation, and the significance of those risks * * * were vigorously litigated" in that proceeding. *Id.* at 460–61. That simply did not occur in this case.[18]

National Grid is not an unincorporated division of National Grid plc, but rather a corporate entity organized under the laws of this state. *See Public Service Commission of New York*, 813 F.2d at 458. There is also ample evidence in the record that National Grid has its own capital structure; indeed, the PUC found as a fact that the capital structure that the company had in place was unreasonable for ratemaking purposes. *See id.* at 458–59. Also, it cannot be gainsaid that because neither National Grid nor the division proposed using the capital structure of National Grid plc as a factor in determining an appropriate capital structure for the company, there

---

17. In the decision and order dated April 29, 2010, a typographical error indicated that "[o]nly five percent of National Grid plc's operations are regulated." In fact, it is apparent that 95 percent of National Grid plc's operations are regulated.

18. In his dissent, PUC Chairman Germani declared "no party is recommending the use of the National Grid plc capital structure and there is no testimony or evidence on the record supporting its use or in any way indicating that it could or would be reasonable or appropriate."

was a glaring lack of vigorous litigation concerning the issue. *See id.* at 460–61.

We agree with the company that the other cases cited by the PUC to support the imposition of a parent company's capital structure are factually distinguishable. This is so because each of those cases featured a double leveraging analysis, supported by evidence in the record such as detailed expert testimony, unincorporated subdivisions (for which there was no actual capital structure), detailed testimony by the company's own experts that focused exclusively on a parent corporation and that did not treat the company as a separate entity, or regional or domestic companies, and not foreign, partly unregulated corporations such as National Grid plc. Based on the facts specific to this case, as well as the dearth of evidence in the record upon which the PUC predicated its decision, we are led to the conclusion that the PUC engaged in an analysis that was preordained to justify its use of National Grid plc's capital structure.

▮▮▮ Finally, the company argues that the record evidence does not support the use of a 42.75 percent capital structure. The division's expert testified that the reasonable range for the equity component of

the capital structure of a regulated entity such as National Grid would be between 45–50 percent. The company contends that the 42.75 percent equity component of the capital structure approved by the commission fell well outside the range of reasonableness recommended by any expert who testified in the case, and that there is no other record evidence that would support this conclusion.[19] *See Newport Electric Corp.*, 624 A.2d at 1101. We agree.

In our opinion, the PUC failed to provide sufficient evidentiary foundation for its decision to make use of the capital structure of a twice removed, foreign parent company, and then simply average it with the capital structure recommended by the division's expert. *See Rhode Island Consumers' Council*, 111 R.I. at 277, 302 A.2d at 763. We further are puzzled by the fact that the PUC rejected the capital structure recommended by the division's expert, but then used that very figure to average with the capital structure of National Grid plc to arrive at a common equity percentage of 42.75 percent.[20]

Therefore, we hold that the commission erred when it factored the capital structure of National Grid plc into its determi-

---

**19.** The PUC used the S & P and Moody reports as evidence of the similar risk profile between National Grid and National Grid plc. As the company points out, these reports focused on creditworthiness, and they were not suitable substitutes for analysis and substantial evidence on the record. *See Wakefield Water Co. v. Public Utilities Commission*, 457 A.2d 251, 253 (R.I.1983).

**20.** In a recent order in docket No. 3943, dated January 29, 2009, the PUC rejected the division's proposal to use National Grid plc's capital structure, in part because proper adjustments were not made to recognize the different treatment of regulatory assets in the United Kingdom. It is significant to us that the PUC made such an abrupt about-face in its methods of evaluation of the parent's capi-

tal structure, without notice to National Grid. *See New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376, 1389 (R.I.1982); *Public Service Commission of New York v. Federal Energy Regulatory Commission*, 813 F.2d 448, 451 (D.C.Cir. 1987) ("[W]hen an agency 'seeks to change a controlling standard of law and apply it retroactively in an adjudicatory setting, the party before the agency must be given notice and an opportunity to introduce evidence bearing on the new standard.' "). In this docket, neither party nor any intervenor advocated for the use of National Grid plc's capital structure; indeed the PUC had already ruled in docket No. 3943 that that structure was unreasonable for National Grid and the services that it provides.

nation of an appropriate capital structure for the company.

## B. Incentive Compensation

■ The company also asserts that the PUC erred when it disallowed 50 percent of the expense associated with an incentive pay and benefit structure proposed by National Grid. The commission determined that this expense was unreasonable and excessive because there was insufficient evidence of a direct benefit to ratepayers. In its request, the company asked to increase the test-year expenses by approximately $2.4 million to provide for incentive compensation for certain of its employees. The company contended that the proposed program consisted of wages and benefits that were market competitive, offered flexibility and choice, and supported a high performance culture by directly linking performance to financial rewards.

The company's expert, Mr. Dowd, conceded that although 40–50 percent of the requested incentive pay was linked to individual objectives such as service quality measures, the remainder was directly related to achievement of financial performance and related financial objectives by the company. However, in contrasting testimony, the division's expert, Mr. Effron, said that those types of financial goals were shareholder oriented, and that because it is shareholders who are the primary beneficiaries of increased earnings, it is they that should shoulder the burden of the costs of incentive compensation related to earnings, and not ratepayers.

The PUC found, based on the evidence, that the company had failed to demonstrate that 50 percent of the proposed new expense that would be directly tied to the company's attainment of its financial goals would benefit ratepayers. Further, the commission found that if the company believed that such compensation was necessary, "such amount should be borne by shareholders who are the primary beneficiaries of N[ational] Grid's attainment of its financial goals."

In *Providence Gas Co. v. Malachowski*, 656 A.2d 949, 952 (R.I.1995), we affirmed the PUC's decision to disallow pension benefits for two newly hired executives who were credited with benefits for years during which they had not served the company. We agreed with the commission that ratepayers should not be burdened with such benefits because the executives had not provided any services to them during those years. *Id.*

Another case relied on by the division is factually similar and therefore appropriate for our analysis. In *Commonwealth Edison Co. v. Illinois Commerce Commission*, 398 Ill.App.3d 510, 338 Ill.Dec. 539, 924 N.E.2d 1065, 1078 (2009), a reviewing court upheld a commission's determination that disallowed incentive compensation expenses that provided only a tangential benefit to taxpayers. As in the situation before us, the regulators ruled in that case that ComEd did not "demonstrate a sufficient nexus between the earnings-per-share portion" of the incentive plan and a benefit to ratepayers. *Id.* 338 Ill.Dec. 539, 924 N.E.2d at 1077. In *Commonwealth Edison*, the company's experts testified that incentive compensation plans benefitted everyone, including customers, because when such plans are implemented, productivity rises, more focus is given to customer service, and better employees are attracted to work for the company. *Id.* 338 Ill.Dec. 539, 924 N.E.2d at 1078. Further, it was the opinion of the expert that certain customer-oriented goals could result in operational savings, which would produce the additional benefit of increased earnings for shareholders. *Id.* 338 Ill.Dec. 539, 924 N.E.2d at 1079.

In a similar vein, National Grid's expert testified that the interests of customers and shareholders are not necessarily divergent. The company also argues before this Court that the commission disregarded evidence that programs such as the one it proposed assist in the recruitment of skilled employees, which, in the long run, is in the interest of ratepayers. We agree, however, with the reasoning of the commission that the company failed to demonstrate that the $2.4 million cost associated with the incentive compensation plan would provide significant direct benefits to ratepayers.

Therefore, based on the considerable discretion given to PUC decisions and the substantial evidence in the record on this issue, it is our opinion that the decision about the incentive compensation expense was "fairly and substantially supported by legal evidence." *Newport Electric Corp.*, 624 A.2d at 1101. This Court "will not sit as a policy-making body in reviewing orders of the commission." *Wakefield Water Co.*, 457 A.2d at 253 (citing *Providence Gas Co. v. Burke*, 119 R.I. 487, 380 A.2d 1334 (1977)).

### Conclusion

The order of the commission is affirmed in part and vacated in part. We affirm the commission's decision to disallow 50 percent of the incentive compensation proposed by the company. However that part of the report and order that uses the capital structure of National Grid plc to establish a capital structure for the company is hereby vacated, and the case is remanded to the PUC with instructions that it conduct hearings to determine the appropriateness of the company's current capital structure. At this point, there should be little question that the company's common equity component of its capital structure is known and measurable; therefore, it should be considered by the PUC. Other evidence, such as the capital structure of similarly situated utilities, is also appropriate for consideration at the hearings.

We direct that the hearings be concluded and an order be issued by the commission within ninety days of the date of this opinion.