2025 IL App (2d) 230020
Nos. 2-23-0020 & 2-23-0193 cons.
Opinion filed January 13, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) | On Petition for Administrative Review from the Illinois Commerce Commission. |
| Petitioner, | ) ) ) | |
| v. | ) ) | ICC Case Nos. 22-0442 22-0432 |
| THE ILLINOIS COMMERCE COMMISSION; COMMONWEALTH EDISON COMPANY; WEAVE GRID, INC.; CHARGEPOINT, INC.; ADVACED ENERGY ECONOMY; CITIZENS UTILITY BOARD; NATURAL RESOURCES DEFENSE COUNCIL; ENVIRONMENTAL DEFENSE FUND; SIERRA CLUB; RESPIRATORY HEALTH ASSOCIATION; LITTLE VILLAGE ENVIRONMENTAL JUSTICE ORGANIZATION; and THE CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 Petitioner, the People of the State of Illinois *ex rel.* Kwame Raoul, Attorney General (Attorney General), appeals from a decision by the Illinois Commerce Commission (Commission) approving respondent Commonwealth Edison Company's (ComEd) beneficial electrification plan (BE plan) under section 45 of the Electric Vehicle Act (20 ILCS 627/45 (West 2022)). We affirm.

¶ 2                                I. BACKGROUND

¶ 3    In September 2021, the General Assembly passed Public Act 102-662 (eff. Sept. 15, 2021), commonly known as the Climate and Equitable Jobs Act, to put the state on a path toward 100% clean energy, invest in training a diverse workforce for the jobs of the future, institute key ratepayer and residential customer protections, and prioritize meaningful ethics and transparency reforms. Relevant here, the Climate and Equitable Jobs Act amended the Public Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2022)) and the Electric Vehicle Act (20 ILCS 627/1 *et seq.* (West 2022)) in furtherance of these goals.

¶ 4    Section 8-103B of the Public Utilities Act, as amended by the Climate and Equitable Jobs Act, requires electric utilities to meet specified energy efficiency savings goals. 220 ILCS 5/8-103B(a) (West 2022). The utilities must implement long-term energy efficiency measures, and the rates they charge customers are dependent on whether the utility meets its goals. *Id.* § 8-103B(b)-(g). The statute, though, imposes a retail rate cap on how much the utilities can recoup from their customers. *Id.* § 8-103B(m). If the energy efficiency expenditures result in rates that exceed the cap, the Commission must reduce the utility's spending. *Id.* Utilities are also prohibited from double recovery of energy efficiency costs from customers. *Id.* § 8-103B(d).

¶ 5    Section 8-103B(b-27) of the Public Utilities Act allows utilities to offer and promote measures that electrify fossil fuel dependent systems in building and industrial spaces. *Id.* § 8-103B(b-27). Specifically, it incentivizes electrification of "space heating, water heating, cooling, drying, cooking, industrial processes, and other building and industrial end uses." *Id.* The utilities may "recover the costs of offering and promoting" these electrification measures. *Id.* The recovery of costs is limited to 5% per year from 2022 through 2025, 10% per year from 2026 through 2029, and 15% for 2030 and all subsequent years. *Id.* § 8-103B(b-27)(1)-(3).

¶ 6    The Climate and Equitable Jobs Act added section 45 to the Electric Vehicle Act, which created requirements regarding "beneficial electrification programs" (BE programs). 20 ILCS

627/45 (West 2022). In adding these requirements, the General Assembly intended to "decrease reliance on fossil fuels, reduce pollution from the transportation sector, increase access to electrification for all consumers, and ensure that electric vehicle adoption and increased electricity usage and demand do not place significant additional burdens on the electric system and [do] create benefits for Illinois residents." *Id.* § 45(a). The statute sets out 10 policy goals:

"(1) Illinois should increase the adoption of electric vehicles in the State to 1,000,000 by 2030.

(2) Illinois should strive to be the best state in the nation in which to drive and manufacture electric vehicles.

(3) Widespread adoption of electric vehicles is necessary to electrify the transportation sector, diversify the transportation fuel mix, drive economic development, and protect air quality.

(4) Accelerating the adoption of electric vehicles will drive the decarbonization of Illinois' transportation sector.

(5) Expanded infrastructure investment will help Illinois more rapidly decarbonize the transportation sector.

(6) Statewide adoption of electric vehicles requires increasing access to electrification for all consumers.

(7) Widespread adoption of electric vehicles requires increasing public access to charging equipment throughout Illinois, especially in low-income and environmental justice communities, where levels of air pollution burden tend to be higher.

(8) Widespread adoption of electric vehicles and charging equipment has the potential to provide customers with fuel cost savings and electric utility customers with cost-saving benefits.

(9) Widespread adoption of electric vehicles can improve an electric utility's electric system efficiency and operational flexibility, including the ability of the electric utility to integrate renewable energy resources and make use of off-peak generation resources that support the operation of charging equipment.

(10) Widespread adoption of electric vehicles should stimulate innovation, competition, and increased choices in charging equipment and networks and should also attract private capital investments and create high-quality jobs in Illinois." *Id.* § 45(a)(1)-(10).

¶ 7 The statute defines BE programs as

"programs that lower carbon dioxide emissions, replace fossil fuel use, create cost savings, improve electric grid operations, reduce increases to peak demand, improve electric usage load shape, and align electric usage with times of renewable generation. All [BE] programs shall provide for incentives such that customers are induced to use electricity at times of low overall system usage or at times when generation from renewable energy sources is high." *Id.* § 45(b).

It lists 15 examples of BE programs:

"(1) time-of-use electric rates;

(2) hourly pricing electric rates;

(3) optimized charging programs or programs that encourage charging at times beneficial to the electric grid;

(4) optional demand-response programs specifically related to electrification efforts;

(5) incentives for electrification and associated infrastructure tied to using electricity at off-peak times;

(6) incentives for electrification and associated infrastructure targeted to medium-duty and heavy-duty vehicles used by transit agencies;

(7) incentives for electrification and associated infrastructure targeted to school buses;

(8) incentives for electrification and associated infrastructure for medium-duty and heavy-duty government and private fleet vehicles;

(9) low-income programs that provide access to electric vehicles for communities where car ownership or new car ownership is not common;

(10) incentives for electrification in eligible communities;

(11) incentives or programs to enable quicker adoption of electric vehicles by developing public charging stations in dense areas, workplaces, and low-income communities;

(12) incentives or programs to develop electric vehicle infrastructure that minimizes range anxiety, filling the gaps in deployment, particularly in rural areas and along highway corridors;

(13) incentives to encourage the development of electrification and renewable energy generation in close proximity in order to reduce grid congestion;

(14) offer support to low-income communities who are experiencing financial and accessibility barriers such that electric vehicle ownership is not an option; and

(15) other such programs as defined by the Commission." *Id.* § 45(b).

¶ 8 The Electric Vehicle Act requires utilities serving more than 500,000 customers to file with the Commission a BE plan that outlines the utility's BE programs. *Id.* § 45(d). The process begins with a workshop between Commission staff and each utility for the purpose of "soliciting input on the design of [BE] programs that the utility shall offer." *Id.* § 45(c).

¶ 9　Each utility's BE plan must take into consideration the recommendations from the workshop with the staff. *Id.* § 45(d). After the plan is filed, the Commission must investigate the plan "to consider whether the plan meets the objectives and contains the information required by" section 45 of the Electric Vehicle Act. *Id.* The proposed plan must address, "at a minimum, the following:"

> "(i) make-ready investments to facilitate the rapid deployment of charging equipment throughout the State, facilitate the electrification of public transit and other vehicle fleets in the light-duty, medium-duty, and heavy-duty sectors, and align with Agency-issued rebates for charging equipment;
>
> (ii) the development and implementation of [BE] programs, including time-of-use rates and their benefit for electric vehicle users and for all customers, optimized charging programs to achieve savings identified, and new contracts and compensation for services in those programs, through signals that allow electric vehicle charging to respond to local system conditions, manage critical peak periods, serve as a demand response or peak resource, and maximize renewable energy use and integration into the grid;
>
> (iii) optional commercial tariffs utilizing alternatives to traditional demand-based rate structures to facilitate charging for light-duty, heavy-duty, and fleet electric vehicles;
>
> (iv) financial and other challenges to electric vehicle usage in low-income communities, and strategies for overcoming those challenges, particularly in communities and for people for whom car ownership is not an option;
>
> (v) methods of minimizing ratepayer impacts and exempting or minimizing, to the extent possible, low-income ratepayers from the costs associated with facilitating the expansion of electric vehicle charging;

(vi) plans to increase access to Level 3 Public Electric Vehicle Charging Infrastructure to serve vehicles that need quicker charging times and vehicles of persons who have no other access to charging infrastructure, regardless of whether those projects participate in optimized charging programs;

(vii) whether to establish charging standards for type of plugs eligible for investment or incentive programs, and if so, what standards;

(viii) opportunities for coordination and cohesion with electric vehicle and electric vehicle charging equipment incentives established by any agency, department, board, or commission of the State, any other unit of government in the State, any national programs, or any unit of the federal government;

(ix) ideas for the development of online tools, applications, and data sharing that provide essential information to those charging electric vehicles, and enable an automated charging response to price signals, emission signals, real-time renewable generation production, and other Commission-approved or customer-desired indicators of beneficial charging times; and

(x) customer education, outreach, and incentive programs that increase awareness of the programs and the benefits of transportation electrification, including direct outreach to eligible communities." *Id.*

¶ 10    Further, the "Commission shall determine if the proposed plan is cost-beneficial and in the public interest." *Id.* Section 45(d) specifies eight public interest criteria for the Commission to consider:

"(1) maximize total energy cost savings and rate reductions so that nonparticipants can benefit;

(2) address environmental justice interests by ensuring there are significant opportunities for residents and businesses in eligible communities to directly participate in and benefit from [BE] programs;

(3) support at least a 40% investment of make-ready infrastructure incentives to facilitate the rapid deployment of charging equipment in or serving environmental justice, low-income, and eligible communities; however, nothing in this subsection is intended to require a specific amount of spending in a particular geographic area;

(4) support at least a 5% investment target in electrifying medium-duty and heavy-duty school bus and diesel public transportation vehicles located in or serving environmental justice, low-income, and eligible communities in order to provide those communities and businesses with greater economic investment, transportation opportunities, and a cleaner environment so they can directly benefit from transportation electrification efforts; however, nothing in this subsection is intended to require a specific amount of spending in a particular geographic area;

(5) stimulate innovation, competition, private investment, and increased consumer choices in electric vehicle charging equipment and networks;

(6) contribute to the reduction of carbon emissions and meeting air quality standards, including improving air quality in eligible communities who disproportionately suffer from emissions from the medium-duty and heavy-duty transportation sector;

(7) support the efficient and cost-effective use of the electric grid in a manner that supports electric vehicle charging operations; and

(8) provide resources to support private investment in charging equipment for uses in public and private charging applications, including residential, multi-family, fleet, transit, community, and corridor applications." *Id.*

¶ 11    Section 45 further states that the "retail rate impact from the development of electric vehicle infrastructure," however, "shall not exceed 1% per year of the total annual revenue requirements of the utility." *Id.* § 45(g).

¶ 12    ComEd submitted its proposed BE plan to the Commission in July 2022. It proposed spending $100 million per year through several programs, including expenditures on nontransportation related programs. Two of those programs are relevant for this dispute: (1) "residential," on which ComEd proposed $15 million in expenditures, and (2) "commercial, industrial, and public sector," on which ComEd proposed $63 million in expenditures. These programs would include $10 million of nontransportation-related spending. Four million dollars of the residential program's funding would be dedicated to "rebates for residential customers to support the adoption of *** high efficiency electric heat pumps, electric lawn equipment, induction cooking equipment, and electric clothes dryers ***." The commercial, industrial, and public sector program would include $6 million for "rebates for small business customers located in" underprivileged communities "to help cover costs associated with nontransportation [beneficial electrification] adoption" including "heat pumps, water heaters, or commercial food service equipment."

¶ 13    ComEd asserted that its BE plan complied with the Electric Vehicle Act's 1% retail rate cap. It interpreted the cap as applying to only the portion of its BE plan that was directed toward electric vehicle infrastructure, which totaled $15 million. ComEd excluded from its calculations the remaining $85 million of funding, which included "programs which provide vehicle purchase rebates, support nonEV measures, provide education, or institute pilots unrelated to EV infrastructure." ComEd also interpreted "total annual revenue requirements" as "the sum of all its revenue requirements, including distribution, transmission, energy efficiency, [specific rebates], and supply components among others." Under this interpretation, ComEd calculated its revenue

requirements at $4.7 billion, 1% of which was $47 million. Thus, ComEd determined that its $15 million in electric vehicle infrastructure expenditures did not exceed the 1% cap.

¶ 14    After receiving ComEd's BE plan, Commission staff initiated proceedings under section 45(d) of the Electric Vehicle Act. The Attorney General and several environmental groups, including the Environmental Defense Fund, the Sierra Club, and the Respiratory Health Association (collectively, the Environmental Groups) intervened and participated in the proceedings. The staff moved to dismiss portions of ComEd's proposed BE plan on September 2, 2022. The staff argued that ComEd's BE plan included spending on activities unauthorized by the Electric Vehicle Act and exceeded the statute's retail rate cap. Specifically, the staff argued that, based on section 45's plain language, the statute was focused on electric vehicles and the infrastructure to support their use. Consideration of section 45—including all 10 policy goals, half of the 15 example BE programs and 6 of the 8 public interest factors—shows it explicitly related to electric vehicles, electric vehicle charging infrastructure, and transportation in general. The staff argued that the statute requires the utilities to update the Commission regarding "transportation investments" made under the plans. In the staff's view, this means the Electric Vehicle Act does not allow ComEd to include nontransportation spending in its BE plan. The staff contended that this nontransportation spending is controlled by section 8-103B of the Public Utilities Act. Allowing such spending in a BE plan would allow ComEd to bypass section 8-103B's spending caps.

¶ 15    Additionally, the staff asked the Commission to issue an interim order interpreting section 45(g) of the Electric Vehicle Act. The staff believed that ComEd read section 45(g) too broadly to include all of its rates and charges under its definition of "total annual revenue requirements." This interpretation, the staff argued, made the 1% retail rate cap impermissibly high, thus maximizing the amount of money ComEd could recoup from its customers. On the other hand, the staff argued

that ComEd interpreted "retail rate impact" too narrowly to include only two of its BE programs, thus applying the 1% cap to the smallest portion of the BE plan. The staff argued that ComEd's interpretation "neuters the intent of the statutory spending cap." The staff therefore asked the Commission to interpret section 45(g) so that the 1% cap applies to the entirety of the BE plan, which should include only transportation-related spending.

¶ 16    The Attorney General, ComEd, the Environmental Groups, and other intervenors each filed a response to the staff's motion. The Attorney General supported the staff's arguments and requests. The Attorney General additionally asked the Commission to clarify how section 45(g)'s spending cap should be determined. It argued that section 45 required that the retail rate cap be calculated as 1% of ComEd's delivery service revenue requirement alone, rather than the totality of ComEd's various revenue requirements.

¶ 17    ComEd argued that nothing in the Electric Vehicle Act limited beneficial electrification plans to only transportation-related spending. It argued that section 45 defined BE programs broadly, without referring to electric vehicles or transportation. Additionally, ComEd argued that section 45 discussed several portfolio programs that were not explicitly transportation related. The Environmental Groups also supported ComEd's interpretation.

¶ 18    An administrative law judge denied the staff's motion and issued a proposed interim order, which the Commission adopted as its interim order. The Commission found that "the plain language of Section 45 of the [Electric Vehicle Act] is broad and does not contain a limitation that programs may only apply to transportation-related electrification." It noted that the Electric Vehicle Act has a "wide-ranging definition" of "beneficial electrification" and includes a nonexhaustive list of BE programs, not all of which are specifically related to transportation. The Commission also found that the language of the statute "provides flexibility" as to what programs may be included, because it allows for "other such programs as defined by the Commission." It

determined that the plain language of the statute was determinative and it need not further speculate into the intent of the General Assembly. Thus, the Commission found that the nontransportation-related BE programs are not precluded by the Electric Vehicle Act.

¶ 19     Regarding the retail rate cap, the Commission concluded that "[t]he plain language of the statute clearly states that the retail rate cap applies to development of EV infrastructure. *** [T]he Commission cannot overlook the plain language of the statute. There is no reason to look further to ascertain the General Assembly's intent." The Commission noted the staff and the Attorney General's concern regarding the amount of spending under the BE plan but pointed out that the statute requires that the BE plan be "cost-beneficial." See *id.* § 45(d). Thus, the Commission believed that this is a sufficient restraint on the amount of spending under the BE plan.

¶ 20     The Commission also concluded that there was no merit to the Attorney General's argument that the phrase "total annual revenue requirements" refers to only the revenue requirement for delivery services. It found that the Attorney General's interpretation "would require the Commission to read into the statute a limitation that does not exist in its plain language, and thus would violate the principles of statutory interpretation." Thus, the Commission accepted ComEd's reading that the statute encapsulated multiple revenue requirements. The Attorney General petitioned this court for review of the Commission's interim order. This appeal was docketed in this court as appeal No. 2-23-0020.

¶ 21     In the merits proceedings, the Attorney General and the staff reiterated their same arguments. The Attorney General also argued that the Commission's conclusion that applying the section 45(g) cap solely to direct spending on transportation would lead to the absurd result of the cap applying to only 16% of the $100 million ComEd proposed to spend in its BE plan. The Attorney General additionally claimed that the Commission's "cost-beneficial" safeguard would not achieve the Commission's stated purpose because higher spending would be allowable if the

benefits outweighed the costs. Thus, the Attorney General argued, there would be no purpose of the statutory cap if the cost-benefit analysis were sufficient to control spending.

¶ 22    In response, ComEd reiterated its arguments that the statute did not limit BE programs to transportation-related programs, that the retail rate cap applies only to direct spending on electric vehicle infrastructure, and that "total annual revenue requirements" included its full portfolio of rate-related revenues. ComEd also argued that inclusion of nontransportation electrification technologies was a critical component of an effective BE plan because carbon emissions from nontransportation sectors exceeded those of nonelectric transportation in the state. The Environmental Groups again supported ComEd's interpretation of the Electric Vehicle Act.

¶ 23    The Commission issued its final order on March 23, 2023. It rejected the staff's and the Attorney General's constructions of the Electric Vehicle Act and their proposed BE plan budgets based on those interpretations. While the Commission concluded that the Electric Vehicle Act allowed for nontransportation-related spending, it removed several nontransportation programs to alleviate the Attorney General's concerns regarding the size of the budget. In an effort to ensure no inappropriate overlap between ComEd's BE plan and previous approved energy efficiency plans under the Public Utilities Act, the Commission also ordered that ComEd must keep each plan's spending separate. Additionally, ComEd could not transfer funds between transportation and nontransportation programs. The Commission thus approved ComEd's BE plan with a modified overall budget of $77 million per year, including $26 million on transportation infrastructure.

¶ 24    The Attorney General unsuccessfully applied for rehearing before the Commission. The Attorney General then petitioned for review in this court. That case was docketed in this court as appeal No. 2-23-0193, which we consolidated with appeal No. 2-23-0020.

¶ 25                                II. ANALYSIS

¶ 26    The Attorney General's first contention on appeal is that the Commission erred by interpreting the Electric Vehicle Act to allow nontransportation-related spending in BE plans. Specifically, the Attorney General asserts that (1) the definition of BE plans in section 45(b) is limited to transportation-related spending, (2) the plain language of section 45 considered altogether demonstrates that BE plans include only transportation-related spending, and (3) the Climate and Equitable Jobs Act placed transportation-focused BE plans in the Electric Vehicle Act and nontransportation electrification in other statutes. Alternatively, the Attorney General argues that, if this court determines that section 45 is ambiguous, we should reject the Commission's interpretation because it goes against the General Assembly's clear intent and leads to absurd results.

¶ 27    The primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). The best evidence of the legislature's intent is the language of the statute itself. *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 451-52 (1997). Statutes must not be read in isolation, but as a whole; all relevant parts of the statute must be considered when courts attempt to define the legislative intent underlying the statute. *People v. NL Industries*, 152 Ill. 2d 82, 98 (1992). Moreover, when an act defines its terms, those terms must be construed according to the definitions contained in the act. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 540 (1997).

¶ 28    Courts are not bound by the Commission's rulings on questions of law, which we review *de novo*. *Illinois Landowners Alliance, NFP, v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. However, courts have consistently afforded "substantial weight and deference" to the Commission's interpretation of a statute that it is charged with administering and enforcing. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2019 IL App (2d) 180504, ¶ 56. "A

significant reason for this deference is that courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise." *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 153. As this case involves precisely the type of complex statute where the Commission's experience and expertise is valuable, we afford "substantial weight and deference" to its interpretation of the Electric Vehicle Act. See *Commonwealth Edison Co.*, 2019 IL App (2d) 180504, ¶ 56.

¶ 29    Based on our reading of the Electric Vehicle Act, we agree with the Commission that the Electric Vehicle Act allows nontransportation-related spending in BE plans. A primary purpose of the Electric Vehicle Act is to encourage more people to drive electric vehicles. 20 ILCS 627/5 (West 2022). The General Assembly recognizes that this could place additional burdens on the electric system. *Id.* § 45(a). The General Assembly therefore wants to encourage electric utility companies to implement programs that "create cost savings, improve electric grid operations, reduce increases to peak demand, improve electric usage load shape, and align electric usage with times of renewable generation." *Id.* § 45(b). The legislature envisions that these programs will also benefit people who do not use electric vehicles. *Id.* § 45(c)(1). As such, the Commission did not err in approving ComEd's BE plan just because that plan included nontransportation-related spending.

¶ 30    In so ruling, we reject the Attorney General's arguments that BE plans may apply only to transportation-related spending. The Attorney General first points us to section 45(b) and the "eight specific, mandatory programs [that] explicitly reference EVs, vehicle charging, and other transportation programs." The Attorney General then notes that there are "[s]ix generic programs [that] address issues like rate design, grid construction, and additional incentives for low-income communities." The Attorney General argues that these generic programs must be read in conjunction with the more specific transportation-focused programs. In doing so, the Attorney

General therefore insists that "BE programs" in section 45(b) means transportation-related programs.

¶ 31    There are multiple problems with the Attorney General's argument. First, although parts of section 45 refer to "electric vehicles" or "transportation," the definition of BE programs in section 45(b) never uses those terms. *Id.* § 45(b). If the General Assembly intended to make BE plans apply only to transportation-related spending, it could have done so by specifically referring to "electric vehicles" or "transportation" in the definition it provides. Second, section 45(b) does not classify some of the possible BE programs as generic and others as specific. It also does not list the transportation-related programs separately from the nontransportation programs. This indicates that the General Assembly did not intend the transportation-related BE programs to be given greater significance than the nontransportation BE programs. Thus, the plain language of section 45(b) does not support the Attorney General's argument.

¶ 32    This determination is not altered by looking at the entirety of section 45. The Attorney General argues to the contrary, pointing to various points of the Electric Vehicle Act that suggest BE plans are to be limited to transportation-related spending. In doing so, however, the Attorney General minimizes other provisions that do not indicate that BE plans are to be so limited. For example, the Attorney General accentuates two of the reasons the General Assembly sets forth in section 45(a) for promoting beneficial electrification (*id.* § 45(a) ("reduce pollution from the transportation sector" and "ensure that electric vehicle adoption *** do[es]  not place significant additional burdens on the electric system")) while overlooking three that do not support its argument (*id.* ("decrease reliance on fossil fuels," "increase access to electrification for all consumers," and "ensure that *** increased electricity usage and demand do not place significant additional burdens on the electric system and [do] create benefits for Illinois residents")). When considered in context, all of the provisions that the Attorney General points to in isolation do not

support its argument that the General Assembly intended to limit BE plans to transportation-related spending.

¶ 33    We also reject the Attorney General's related argument that, looking at the Climate and Equitable Jobs Act in its entirety, it is apparent that the General Assembly placed transportation-focused BE programs in the Electric Vehicle Act and nontransportation electrification in other statutes, such as the Public Utilities Act. The Attorney General contends that, unlike section 45(b), section 8-103B(b-27) of the Public Utilities Act explicitly authorizes utilities to "offer and promote measures that electrify space heating, water heating, cooling, drying, cooking, industrial processes, and other building and industrial end uses that would otherwise be served by combustion of fossil fuel at the premises." 220 ILCS 5/8-103(B)(b-27) (West 2022). The Attorney General insists that, because the legislature placed BE plans in the Electric Vehicle Act and nontransportation spending in the Public Utilities Act, this means that the General Assembly intended that transportation-related BE plans be solely in the Electric Vehicle Act and that nontransportation spending be in the Public Utilities Act.

¶ 34    In looking at both the Electric Vehicle Act and the Public Utilities Act, there is no indication that the legislature intended to divide the authorization of nontransportation-related and transportation-related spending between the Electric Vehicle Act and the Public Utilities Act. Section 8-103B of the Public Utilities Act does not state or imply that nontransportation electrification programs or measures may be proposed and considered only as part of an electric utility's energy efficiency plans. *Id.* § 8-103(B). Moreover, as noted above, section 45 of the Electric Vehicle Act does not prohibit nontransportation electrification as part of a BE plan. See 20 ILCS 627/45 (West 2022). To find that there is division intended between the two acts would require us to read language into the statutes, which of course is something that we may not do. See *Hernandez v. Lifeline Ambulance, LLC*, 2019 IL App (1st) 180696, ¶ 10 (courts are not at liberty

to depart from the plain language of a statute by reading into it exceptions, conditions, or limitations that the legislature did not express). Instead, we believe that the two acts can be read in harmony. That being said, the General Assembly recognized that various and complementary programs would be necessary to achieve its goal of broad electrification.

¶ 35　We further reject the Attorney General's argument that to interpret section 45 of the Electric Vehicle Act to allow nontransportation spending in BE plans would violate section 8-103B(d) of the Public Utilities Act, which prohibits utilities from "double recovery of [energy efficiency] costs from customers." 220 ILCS 5/8-103B(d) (West 2022). Specifically, the Attorney General points to the rate cap in section 8-103B(b-27)(1) that limits the rate bonuses that a utility can obtain for encouraging electrification instead of fossil fuel consumption. See *id.* § 8-103B(b-27)(1). The Attorney General contends that a utility could circumvent that limit by obtaining benefits under both the Electric Vehicle Act and the Public Utilities Act for nontransportation spending.

¶ 36　The Attorney General's argument is ultimately hypothetical, the Commission has already determined that ComEd cannot count its nontransportation BE plan savings in the Electric Vehicle Act towards its energy efficiency goals in the Public Utilities Act. Because the Commission's determination does not undermine the prohibition against double recovery in the Public Utilities Act, the Attorney General's concerns are unfounded.

¶ 37　Lastly, as we do not believe that the Electric Vehicle Act is ambiguous, we need not address the Attorney General's alternative argument that we should reject the Commission's interpretation of the Electric Vehicle Act because it would lead to absurd results.

¶ 38　The Attorney General's second contention on appeal concerns the proper interpretation of section 45(g). The specific language at issue states:

"The Commission shall consider revenues from electric vehicles in the utility's service territory in evaluating the retail rate impact. The retail rate impact from the development of electric vehicle infrastructure shall not exceed 1% per year of the total annual revenue requirements of the utility." 20 ILCS 627/45(g) (West 2022).

The Commission agreed with ComEd's interpretation of the above language that (1) the retail rate cap applies to electric vehicle infrastructure development and not the entire BE plan and (2) the rate cap is premised on the sum of the utility's multiple revenue requirements and not merely the delivery service revenue requirement. The Attorney General argues that this interpretation is wrong, asserting that (1) the inclusion of the word "development" transforms the meaning of section 45(g) to create a spending cap for every element contained in a BE plan and (2) "revenue requirement" is a term of art that refers only to a utility's delivery service requirement.

¶ 39   We agree with the Commission's interpretation, as it is consistent with the plain language of the statute. Section 45(g) states that the retail rate cap applies to the development of electric vehicle infrastructure, not the total cost of a BE plan. To find otherwise would require us to read additional language into the statute, which of course we will not do. *Hernandez*, 2019 IL App (1st) 180696, ¶ 10. We further note that the Attorney General's premise for this argument is based on its earlier contention that BE plans can be spent only on transportation-related electrification. As such, according to the Attorney General, spending on BE plans and the development of EV infrastructure would necessarily be the same. As explained above, that contention is without merit.

¶ 40   We also reject the Attorney General's argument that construing the retail cap as applying only to electric vehicles and transportation-related programs leaves no limit on nontransportation-related spending. This argument minimizes the Commission's obligations under the statute to ensure that all nontransportation programs are cost-beneficial and, therefore, just and reasonable. See 20 ILCS 627/45(d) (West 2022) ("The Commission shall determine if the proposed plan is

cost-beneficial and in the public interest."). As the Commission points out, this obligation is reflective of its "primary and overarching duties to ensure that a utility's rates are just and reasonable." See 220 ILCS 5/9-101 (West 2022) ("All rates or other charges made, demanded or received by any product or commodity furnished or to be furnished or for any service rendered or to be rendered shall be just and reasonable.").

¶ 41    Furthermore, also consistent with the plain language of the statute is the Commission's interpretation of section 45(g) that "total annual revenue requirements" refers to the sum of multiple revenue requirements that ComEd charges. The Attorney General insists that "total annual revenue requirements" does not actually mean all revenue requirements but means only ComEd's delivery service revenue requirement. This is because "revenue requirement" is a term of art that is based on the formula annunciated in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195-96 (1991), *Citizen Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 210 (1988), *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2013 IL App (2d) 120334, ¶ 13, and *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 515 (2009). However, each of those cases addresses a utility's "revenue requirement" in the singular and situations where only the utility's delivery service requirement was at issue.

¶ 42    Moreover, had the General Assembly intended to refer to the narrower "delivery service requirement," or even a singular "revenue requirement," it could have easily done so. *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board*, 235 Ill. App. 3d 709, 719 (1992). For example, in article IX of the Public Utilities Act, the General Assembly utilizes a more limited utility revenue benchmark in the context of natural gas surcharges for public utilities. There, the General Assembly limited the cumulative amount of increases billed under the surcharge to an annual average of 4% of the utility's "delivery base rate revenues." 220 ILCS 5/9-

220.3(g) (West 2022). Thus, the Public Utilities Act demonstrates that if the General Assembly had wanted to limit ComEd's "total annual revenue requirements" to just "delivery service revenue requirements," it knew exactly how to do so.

¶ 43    The Attorney General maintains that revenue requirements are distinct from other rates and charges, which explicitly cannot affect a utility's revenue requirements. The Attorney General points out that "other charges and rates that utilities can employ include riders, adjustments, and pass-through charges," which it contends "are established in separate proceedings from a utility's general rate case" and "cannot affect a utility's revenue requirements." We do not dispute that other revenue may be recovered outside of a utility's rate case. However, that is not evidence that the General Assembly intended for "total annual revenue requirements" in the Electric Vehicle Act to be read as "delivery services revenue requirement."

¶ 44    Finally, as we believe that the language of section 45(g) is clear and unambiguous, we need not consider the Attorney General's alternative argument that, if we were to find the language ambiguous, we must reject the Commission's interpretation because it would go against the General Assembly's clear intent and lead to absurd results.

¶ 45                                    III. CONCLUSION

¶ 46    For the foregoing reasons, we affirm the Commission's decision.

¶ 47    Affirmed.

*People ex rel. Raoul v. Illinois Commerce Comm'n*, **2024 IL App (2d) 230020**

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, Nos. 22-0432, 22-0442. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Benjamin F. Jacobson, Assistant Attorney General, of counsel), for petitioner. |
| **Attorneys for Appellee:** | Brian J. Dodds, Robert W. Funk, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission. |
| | Ronit Barrett, Monique C. Patton Woody, and Sharon Kim, of Commonwealth Edison Company, and Hanna Conger, of Benesch, Friedlander, Copland & Aronoff LLP, both of Chicago, for respondent Commonwealth Edison Company. |
| | William M. Shay, of Westervelt, Johnson, Nicoll & Keller, LLC, of Peoria, and Robert A. Weinstock, of Northwestern Pritzker School of Law Environmental Advocacy Center, of Chicago, for respondents Environmental Defense Fund, Sierra Club, and Respiratory Health Association. |
| | No brief filed for other respondents. |